GRUNBERG v. UNITED STATES. BAITLER v. SAME. TRAFTON v. SAME. SHEDD v. SAME.

(Circuit Court of Appeals, First Circuit. April 27, 1906.)

Nos. 598–601.

**1. INDICTMENT—CONSPIRACY OF OFFICERS TO DEFRAUD UNITED STATES.**

Officers in the revenue service, who conspire with others to defraud the United States, may be prosecuted therefor, under Rev. St. § 3169 [U. S. Comp. St. 1901, p. 2059], or they may be joined with the individual conspirators in an indictment under section 5440 [U. S. Comp. St. 1901, p. 3676].

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Indictment and Information, §§ 327–333.]

**2. SAME—TRIAL—MATTERS DISCRETIONARY WITH COURT.**

The taking of a plea of guilty from one of a number of defendants jointly indicted for conspiracy, in open court, and in the presence of the jury panel, is a matter within the discretion of the trial court, and does not constitute error for which a judgment of conviction against the other defendants will be reversed.

**3. SAME—INSTRUCTIONS.**

On the trial of members of a partnership charged with conspiracy to defraud the United States by obtaining the entry of imported goods at less than their true valuation, a refusal to charge that the failure of defendants to produce invoices of the goods on notice by the United States, or to produce their employés as witnesses, could not be considered against them, and the giving of a contrary charge that the jury might consider such facts *held* not reversible error, in view of the condition of the record.

**4. CUSTOMS DUTIES—UNDERVALUATION—CONSPIRACY—PROSECUTION—EVIDENCE.**

On an issue as to the contents and value of certain cases of imported goods which defendants were charged with having secured the entry of at an undervaluation through a conspiracy, the testimony of a witness who assisted in the selection and packing of the goods by the foreign seller was not inadmissible, because he did not take part in nor witness all of the steps taken from the selection of the goods for shipment to the closing of the cases and their shipment, and consequently could not testify from his own knowledge to the ultimate fact; but his testimony is admissible, so far as it relates to pertinent facts within his knowledge, to be considered in connection with that of other witnesses and the established course of business in the establishment.

**5. CRIMINAL LAW—APPEAL—REVIEW—HARMLESS ERROR—ADMISSION OF EVIDENCE.**

In the absence of more specific exceptions than appears in the record, the admission in evidence of a general statement by such a witness of the contents of a particular case, made on reference to an invoice made at the time, was not prejudicial error, where the jury were instructed to consider his evidence only in relation to facts within his personal knowledge, and from his entire evidence the jury could readily determine what facts were so within his knowledge.

**6. WITNESSES—REFRESHING MEMORY FROM BOOKS—CONTEMPORANEOUSNESS OF ENTRY.**

Ledger entries in the books of a large mercantile partnership, showing the gross amounts of invoices of goods sold to a customer, and payments received thereon, posted at the close of the calendar month in which the sale was made, are sufficiently contemporaneous that they may be referred to by a partner for the purpose of refreshing his memory as to such facts, where they were examined by him at or near the time of their entry and then known by him to be correct.

[Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 881, 882, 887, 888.]

145 F.—6

7. CUSTOMS DUTIES—UNDERVALUATION—CONSPIRACY—INDICTMENT—VARIANCE.

Where an indictment charged a conspiracy to defraud the United States of moneys thereafter to become due from a certain mercantile firm as customs duties, proof that the merchandise in question was consigned to a firm of customs brokers, who paid the duties thereon, was not a variance; the goods being owned by the mercantile firm, and so consigned only for convenience of entry.

8. SAME—TRIAL—EVIDENCE.

A defendant, who was an examiner in the customhouse, was charged with conspiracy with his codefendants to permit the entry of goods subject to an ad valorem duty at an undervaluation. It was shown that two cases of goods passed by him were throughout of much higher grade than shown by the invoices, and that each contained a number of inclosed packages, and on cross-examination that he examined only one package out of the two cases. *Held*, that evidence offered by him to show that it was his custom, with respect to the goods of all importers, to examine one package only of a case in which the goods were all of one kind, and that it was not unusual for him to pass two cases on examination of one, was properly excluded as immaterial on the question of his fraudulent intent, since under the facts shown the examination of the single package was sufficient to have shown the fraudulent character of the entry.

In Error to the District Court of the United States for the District of Massachusetts.

See 131 Fed. 137.

Boyd B. Jones (Marshall P. Thompson and Horatio N. Allin, on the brief), for plaintiffs in error Samuel Grünberg and Charles A. Baitler.

Everett W. Burdett (Joseph H. Knight, on the brief), for plaintiff in error John W. Trafton.

Charles K. Cobb, for plaintiff in error James A. Shedd.

William H. Garland, Asst. U. S. Atty., and John H. Casey, Special Asst. U. S. Atty.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. These writs of error represent a joint indictment under section 5440 of the Revised Statutes [U. S. Comp. St. 1901, p. 3676], alleging a conspiracy to defraud the United States, with certain overt acts stated in the indictment in connection with certain importations alleged to have been made at the port of Boston. The parties indicted were Grünberg, Baitler, and Burman, copartners, doing business in Boston under the style of the "Glasgow Manufacturing Company," who were the importers, Munroe, who represented the customhouse brokers, and Trafton and Shedd, who were officers in the customs service, and examiners of merchandise at the port named. There were pleas and a demurrer, which were overruled, raising certain questions, some of which we will consider. Subsequently, Burman pleaded guilty, and, after verdict against all of the other persons charged, except Munroe, who was acquitted, he was on the 28th day of December, 1904, sentenced to pay a fine. Subsequently, on the 18th day of April, 1905, Grünberg was sentenced to imprisonment for 20 months in the jail at East Cambridge, Baitler for 12 months in the same jail, Trafton for 20 months in the jail at Dedham, and Shedd also

for 20 months in the same jail; each of course being, according to the usual practice, separately sentenced.

The indictment alleges that the Glasgow Manufacturing Company was engaged in importing into the port of Boston from Switzerland certain merchandise, subject to ad valorem, duties, from the 1st day of September, 1901, until the 18th day of October, 1903. The merchandise is described as cotton embroideries, cotton handkerchiefs, mull handkerchiefs, cotton lace curtains, cotton insertions, cotton edgings, cotton shirt fronts, white mull handerchiefs, cotton shams, cotton scarfs, and embroidered handkerchiefs. The conspiracy is alleged to have been formed under date of the 1st day of November, 1901, and its purpose is alleged to have been to defraud the United States of divers large sums of money thereafter to become due to the United States from Grünberg, Baitler, and Burman, as copartners, as customs duties on the importations from Switzerland of large quantities of merchandise of the kinds named. The indictment then proceeds to state the manner in which the conspiracy was to be effectuated, in substance as follows: That Grünberg, Baitler, and Burman, as copartners, were to purchase, near St. Gallen, in Switzerland, from time to time, large quantities of merchandise and cause the same to be packed in packages, the contents of each of which should exceed the sum of $100, but to be exported to Boston and be entered as having little or no commercial value, namely, as clippings of edgings, sample handkerchiefs, discards, designs, cotton sample strips, lace sample corners, and lace samples. The indictment further alleges that the foreign market values of each package imported were to be declared to be less than $100, and, when more than one package was entered, the total market value of all so entered to be included in one entry were to be declared to be less than such sum of $100, so that the whole would apparently be entitled to entry without the production of a consular invoice. The indictment further alleges that it was a part of the conspiracy that Trafton and Shedd, as such examiners, should neglect to do their duty in reference to the examination of the imported merchandise, and, among other things, they were willfully to neglect to truly inform the appraiser concerning the same, and willfully to neglect to make complaints to the collector of the violations of law by Grünberg, Baitler, and Burman. The indictment further alleges the part agreed to be done by Munroe, as customhouse broker, to which we need not refer particularly. Then the indictment proceeds to charge various overt acts covering packages numbered 110, 121, 149, 150, 151, 152, 175, 179, 211, 212, 223, 224, 225, 228, 231, 232, 263, 264,, 339, 340, 344, 371, 372, 373, 377, and, perhaps, some others, all of which we understand did pass the customs and went beyond the custody, and control of the United States, authorities. In addition to the above, the indictment specifies two packages, numbered 271 and 272, which, we understand, did not pass the customs, but were seized, produced at the trial, and examined by the jury. Grünberg, Baitler, Shedd, and Trafton each sued out a writ of error, according to the rules which are supposed to apply here, on the ground that the sentences were several and distinct. Cox v. United

States, 6 Pet. 172, 182, 8 L. Ed. 359; Germain v. Mason, 12 Wall. 259, 20 L. Ed. 392; Wharton's American Criminal Law, § 2347.

In addition to the particular importations which are set out in the indictment, as overt acts, the United States proved other importations, making in all 90 cases of merchandise, all occurring within the stated period within which the alleged overt acts occurred. The purpose in adducing these additional importations was only on the issues of knowledge and intent. The jury was impaneled on October 4, 1904, and the verdict was rendered on December 22, 1904. A great many exceptions were taken, and 141 errors were assigned. Considering the length of the trial, and the volume given to it by the method in which the United States introduced proof of so many importations, the assignment of so large a number of errors might well have been expected. No comment is made on that account, beyond the fact that the multiplicitly of alleged errors has unavoidedly disclosed some which, after full investigation, the plaintiffs in error concluded not to rely on, and has disclosed others which, on account of their minor importance, have not been fully developed in the arguments before us. In view of the fact that so many errors were assigned, we have not felt called on to discuss those which were not fully developed at the trial before us. So far as we fail to allude to the propositions of the parties, it will be understood, therefore, that the omission, for the reasons which we have explained, is either because the propositions have not been urged on us or because the failure to develop them fully has been of such a character, and under such circumstances, that we did not feel called on to investigate the record or the authorities for ourselves.

The first proposition to which we give our attention is an alleged repugnancy on the face of the indictment. It is not specifically set out in any error assigned, but it is claimed to be covered by a long series of alleged errors assigned in a more or less general manner. As this proposition is brought to our attention, we are unable to perceive any repugnancy, while to us the indictment is expressed in this particular in the usual and customary manner. We would hardly know how to express it other than as we find it.

The next point is to the effect that, inasmuch as section 3169 of the Revised Statutes [U. S. Comp. St. 1901, p. 2059] provides a different penalty for an officer of the United States conspiring from that imposed by section 5440 on individuals other than officers, officers cannot be joined in this indictment with individuals. The offense alleged, however, is as expressly stated in each section of the Revised Statutes, namely, as conspiracy "to defraud the United States." Section 5440 follows these words with the words "in any manner or for any purpose," which words do not appear in section 3169. These, however, are mere surplusage. Section 5440 requires a proof of some overt act, which is not required under section 3169; but the offense is the same, and the result will be only that, if the United States joins both officers and individuals in the same indictment, they may be required to prove more than if they proceeded against the officers alone. Were it not for the requirement of section 5440 of an overt act, there would therefore be no difficulty whatever, where both officers and individuals were connected

with the same conspiracy, in charging both in the same indictment with conspiracy "to defraud the United States," if that was the nature of the conspiracy, as it is in the case at bar, and in then proceeding to a joint verdict, to be followed by different sentences; the one for the individuals conforming to section 5440, and the one for the officers to section 3169. The offense with regard to each would be the same, and only the penalties would be different. There could be no more practical difficulty in thus awarding different penalties than there is in the ordinary cases where different penalties are awarded against several individuals found guilty of the same joint offense. It may not, however, be safe to say that this can be done here, on account of the requirement under section 5440 of the overt act in connection with the individuals, while, as we have said, an overt act is not required under section 3169, in connection with the officials.

It is true that section 5440 arose out of the act of March 2, 1867, c. 169, § 30, 14 Stat. 484, while section 3169 arose out of a later act, namely, that of July 20, 1868, c. 186, § 98, 15 Stat. 165. Of course, the incorporation of each in the Revised Statutes leaves each to stand precisely as it did before the revision was enacted. Such is the general rule applicable to the interpretation of revisions, and such is the effect of the act of June 27, 1866, providing for the revision of the statute laws of the United States (14 Stat. 74), in that Congress directed the commissioners to note proposed amendments, while, as to these two sections, the report of 1872 shows no change intended. The act of 1868, now section 3169 of the Revised Statutes, is not to be assumed to have repealed any part of the act of 1867, now section 5440, except so far as the presumption of repeal is unavoidable. Pooler v. United States (opinion passed down on January 21, 1904) 127 Fed. 509, 513, 62 C. C. A. 307. If the act of 1868 imposed a lighter penalty than the act of 1867, this might afford a presumption that, so far as the act of 1868 applied, it superseded the act of 1867; but the penalty under the later act is accepted as being more strenuous than that under the previous act. In the present case, however, the act of 1868, now section 3169, omitted an element not found in the earlier statute, namely, the overt act; so that they do not run in parallel lines, and both enactments should be held to be in full force as to everybody, and the United States are at liberty to proceed under section 5440, proving an overt act, or to proceed as against an officer under section 3169, without the burden of proving any such act. Thus the two may stand together, and the United States may proceed under either without being embarrassed by the other.

No difficulty in reaching this result arises out of the usual method of criminal procedure or the usual rules for construing statutory enactments, and any supposed difficulty is purely fanciful.

The parties pro and con have cited three decisions on this question, which are not at all binding on us because they are from Circuit Courts, and they have only such weight as attaches ordinarily to such names as those of the learned judges who rendered them, but more particularly to the methods in which the respective judgments were considered. The plaintiffs in error cite United States v. McKee, Fed.

Cas. No. 15,683, decided by Judge Dillon on April 8, 1876. His opinion was oral, on a motion for a new trial, without anything to indicate that he gave the matter any special consideration. He probably followed Mr. Justice Miller and Judge Treat in United States v. McDonald, decided in 1875, 3 Dill. 543, Fed. Cas. No. 15,670. Here, without any special consideration being given to the question so far as the opinion shows, it was merely observed that the indictment was good under section 3169, or under section 5440, but not good as against both officers and private individuals. After this opinion was pronounced, the district attorney discontinued as to the private individuals, and the case went to trial against the officers. That these decisions on which the plaintiffs in error rely were somewhat hasty appears from the fact that the carefully considered opinion of Judge Lowell, in United States v. Boyden, 1 Low. 266, 269, Fed. Cas. No. 14,642, supporting the present contention of the United States, decided in July, 1868, and reported in a volume published in 1872, three years before the decisions on which the plaintiffs in error rely, was in no way noticed. This was a thoroughly reasoned opinion, so that, if the citations made pro and con were at all authoritative so far as we are concerned, and we were bound by the weight of authority, we might justly say it was with United States v. Boyden. However, for the reasons we have stated, it seems clear to us that this proposition of the plaintiffs in error cannot be sustained.

The next point taken by the plaintiffs in error is with reference to the plea of guilty by Burman in open court. As we have said, Burman was one of the Glasgow Company, indicted with Grünberg, and Baitler, and pleaded guilty. His plea was taken in the presence of the panel, before the jurors were called, against the objection of the plaintiffs in error. We can, however, hardly regard this as prejudicial, because it is impossible to escape the belief that the fact that Burman had pleaded would come out in the course of the trial, and, also, that it would become a matter of common knowledge about the courtroom, which the entire panel would inevitably be affected by. Moreover, it was the right of the United States to have Burman separately plead guilty, and then to call him as a witness against the other persons indicted, if it so desired. On his pleading guilty, his constitutional protection against self-incrimination ceased. Benson v. United States, 146 U. S. 325, 333, 13 Sup. Ct. 60, 36 L. Ed. 991. This greater right clearly covers the lesser right involved in disposing of Burman in the way in which it was done. Indeed, in the course of its charge, the court informed the jury that Burman had pleaded guilty, as it was proper and right that it should. The true answer to the whole is that this was one of the ordinary incidents of a trial which is within the discretion of the court, and which we cannot revise.

The next topic is stated by the plaintiffs in error in the following manner:

"Did the District Court err in refusing to instruct the jury that no inference of guilt could be drawn from the failure of Grünberg and Baitler to produce, on the notice of the district attorney, or to introduce in evidence any books or invoices of the defendants relating to the crime charged which the jury might believe to be in their personal possession, and in instructing them

that such inference could be drawn from a failure to produce the books and invoices?

"Did the District Court err in instructing the jury that they might draw an inference of the guilt of the defendants Grünberg and Baitler from their failure to call their employés?"

This is really three points, one relating to invoices, one to books, and one to employés as witnesses. As to the invoices: It appeared that true invoices were sent to the Glasgow Company; so that the jury might well find that the Glasgow Company had such invoices. There were, of course, false invoices on which the goods were entered, and some of these false invoices also came from the clerks of the house in Switzerland through whom the goods were purchased. However, no point in this direction was made by the plaintiffs in error. It also appeared that the United States gave Grünberg and Baitler notices to produce the original invoices, and also their books of account. The notices are not in the record; but they are put, so far as the books are concerned, in the following language: "The books of account of the Glasgow Manufacturing Company kept during the period charged in the indictment." That this was too broad a form, so far as the books were concerned, is a rule of practice indirectly applied in Ballmann v. Fagin, 200 U. S. 186, 26 Sup. Ct. 212, 50 L. Ed. ——, and asserted in Hale v. Henkel (in an opinion passed down by the Supreme Court on March 12, 1906) 26 Sup. Ct. 370, 50 L. Ed. ——. However, the notices, too, are of no consequence, because the United States, in their efforts to support the rulings of the trial court, do not rely on them, and the court evidently did not rely on them.

One of the employés of the Glasgow Company was called by the United States and examined as a witness. The United States have not called our attention to anything in the record showing that there were any other employés of the Glasgow Manufacturing Company who knew anything about the matters in question. However, no point of this nature was made by the plaintiffs in error.

This topic comes up in two ways: First, on a request of the plaintiffs in error for an instruction to the jury, and, second, on an instruction which was given. The request was to the effect that the fact that Grünberg and Baitler did not produce at the request of the United States the alleged original invoices was not evidence against any of the respondents. This was refused. We note that this is limited to the invoices. It says nothing about any books. The record exhibits a like request with reference to books of account, but it is admitted that this was an inadvertence, and it is not necessary to refer to it further.

Notwithstanding the request about the invoices, the court authorized the jury to consider whether an innocent man, placed in the position of Grünberg and Baitler, would not have introduced his books, with his employés, and shown that the goods were not of the value alleged by the United States. Plaintiffs in error rely on Boyd. v. United States, 116 U. S. 616, 620, 6 Sup. Ct. 524, 29 L. Ed. 746, but that case related entirely to a question of the constitutionality of a statute which provided that, in a procedure which the court held to be a criminal one, if the party defending failed to produce, after notice from the United States to produce, certain allegations stated by the United States should

be taken as confessed, unless the failure to produce was explained. The court held that this was in violation of the fourth and fifth amendments to the Constitution. The question here, however, relates merely to what has long been recognized by the settled rules of practice with which Boyd v. United States had nothing to do; that is to say, that effect may be given to the voluntary acts and omissions of a person charged with an offense, of which the simplest illustration is the failure or the refusal of a man found in possession of stolen goods to make any explanation in reference thereto. That Boyd v. United States does not supersede the usual rule is apparent from the discussion in the later case of Graves v. United States, 150 U. S. 118, 121, 14 Sup. Ct. 40, 37 L. Ed. 1021.

It is doubtful whether the rules relied on by the United States apply to books of account, and whether they are not limited to what persons charged with an offense might put in evidence if produced, and their books of account they could not usually put in evidence. To apply the rules to such books would be to subject a person charged with an offense to a burden on the one hand which could not be of any avail to him on the other. However, this point was not made by the plaintiffs in error.

These rules never have been carried so far as to imply anything against a person charged with an offense by reason of his not calling witnesses, unless witnesses who were presumed to have special knowledge, and as to whom the alleged criminal may be presumed to have had special information or peculiar control, while the prosecuting authorities had neither. The record shows nothing about this, and, in addition thereto, a peculiar inappropriateness arises from the fact that our attention is called to no evidence that there were any employés, except the one who was called by the United States, who had any knowledge on the matter. This point, however, was not made by the plaintiffs in error. We have already said that no point has been made to us with reference to the subordinate propositions we have named, and, as the record fails to state that there were no books or employés to which the ruling in question might relate, we are justified in assuming that the only points intended to be raised are those which we will now state. This is made clear by the supplemental brief in behalf of the plaintiffs in error, containing the last statements of the aspects of this topic so far as they intend to present them to us. It is true it is said generally that the United States could have called employés as well as could the plaintiffs in error. Here again, however, the plaintiffs in error fail to call attention to any statement in the record with regard to the status of the employés in the particulars to which we have referred. We may further observe that the ruling of the Circuit Court excepted to was, so far as the record shows, at the suggestion of the court itself, and there is nothing to indicate that the United States asked for such a ruling, or that it may not have been one of those academic propositions into which the court sometimes slips in a long trial. At any rate, in view of what we have stated, in view especially of what we have quoted from the record as to what the record contains, and in view also of the fact that the record does not show that the United States

asked for this ruling or insisted on it, so that there is no presumption in favor of the plaintiffs in error in that direction, it rested on the plaintiffs in error to make the record plain and full.

Under the circumstances, we are justified in concluding that, on this topic, the case raises to us only two points, as follows: First, that the rules involved do not apply to employés, and, second, that the proceeding is within Boyd v. United States. We have already shown that Boyd v. United States does not apply. The rule does relate to employés, as stated in Commonwealth v. Clark, 14 Gray, 367, 373, which case may properly be cited here as the trial was in the Massachusetts District, and it also relates generally to witnesses peculiarly within the power of the alleged criminal to produce. Graves v. United States. 150 U. S. 118, 121, 14 Sup. Ct. 40, 37 L. Ed. 7021. While, therefore. it may well be questioned whether the rulings and refusal to rule were correct in all respects and from every aspect, yet they were correct so far as concerns any objections properly raised before us.

The plaintiffs in error object that the court allowed the United States to introduce evidence tending to show that the Glasgow Company made importations of other merchandise than that described in the indictment, and, also, that such merchandise was entered at the custom house at an undervaluation. The difficulty here is that the plaintiffs in error have discussed this proposition as though it concerned additional overt acts in the proper sense of the term, but it related entirely to the intent and knowledge of the persons charged. The evidence was clearly admissible for that purpose.

Another proposition of the plaintiffs in error is covered by the following question which they put:

"Was it error to exclude the evidence offered by the defendant Trafton to the established good reputation, as importers, of Grünberg and the Glasgow Manufacturing Company, entertained by himself and, to his knowledge, by other customs officials, and also the evidence offered by him concerning the threat of one Porter and his belief that the complaints against the Glasgow Manufacturing Company emanated from business rivals, and were in part in execution of the threat of said Porter?"

If this involved simply a purpose of proving the established good reputation of the importers, the evidence offered would clearly have been admissible: but the plaintiffs in error state that Trafton had "testified." or "offered to testify," in regard thereto. We do not understand that any issue was made on that topic pure and simple. It is to be seen that the offer was coupled with certain proposed proofs as to the threats of one Porter, who was not connected in any way with the transactions in issue here. It is plain, under the peculiar circumstances, that this was wholly irrelevant matter, or, at least, so remote that it was within the discretion of the court to exclude it. Therefore, as the offer stood, we cannot take cognizance of it.

With regard to the cases of merchandise numbered 271 and 272, which we have said were seized by the United States, and which were produced at the trial and examined by the jury, the plaintiffs in error make certain propositions which we understand are to the effect, that the testimony was so defective as to Trafton that he could not have been properly charged with reference to them. Both Shedd and

Trafton, however, testified in regard to these cases, and, so far as we understand their testimony, there was sufficient incompatibility between them to require the court to submit to the jury that particular topic.

We now come to a series of topics which connect with each other, and yet, to a very considerable extent, must be treated separately. They are called to our attention by the plaintiffs in error by the following interrogatories:

"Did the court err in admitting in evidence the testimony of one Hans Leumann regarding the character, weight, number, and price of the goods contained in certain cases?"

"Did the court err in allowing the witness Leumann to use certain so called invoice books for the purpose of refreshing his recollection in testifying to the number, weight, character, and price of the contents of certain cases?"

"Did the court err in admitting in evidence the testimony of one Herman Schlaepfer regarding the character, number, and price of the goods contained in certain cases?"

We must also, at the outset in this connection, refer to the charge of the court to the jury as follows:

"In the first place, there is the evidence of the witness Leumann and of the witness Schlaepfer. Leumann testifies, as you remember, what went into those cases. Of course, if Leumann's testimony is to be believed, then as to the question of undervaluation there is an end of it. No one will dispute that. The testimony of the witness Leumann has been attacked. In the first place, it is said that he was testifying to things that he did not personally know. Now, a witness is not allowed to testify to matters which are outside of his personal knowledge. He is allowed, however, in testifying, to refresh his memory by memorandum made in certain ways. I permitted the witness Leumann to refresh his memory by referring to certain books. I did that on his statement as to how he examined those books. I deemed the evidence admissible. I permitted it to go in. I refused to strike it out. You will weigh his evidence. So far as he was not speaking of things of which he knew, you need not regard his evidence. So far as he was speaking of things of which he did know, things which were within his knowledge, you are entitled to attach to his testimony such weight as you think it should have."

Although the learned judge did not expressly repeat to the jury in connection with Schlaepfer's testimony all he thus said with reference to the testimony of Leumann, the way in which he connected Schlaepfer's testimony with Leumann shows that the observations made by him with regard to Leumann applied also to Schlaepfer. Indeed, he afterwards made this clear by the following:

"Then we come next to the witness Schlaepfer, as you will remember. Well, his testimony was attacked in somewhat the same way, and you yourself know how much knowledge he had of the goods which were put into the cases, and you will remember how he testified about that, at least, in a general way, and you will remember how he also was limited to what he knew, and you will attach to the testimony, as to the contents of those cases, such weight as you think should be given to it."

Leumann was the head of the partnership of Leumann, Boesch & Co., of St. Gallen, Switzerland, and the Glasgow Company purchased of Leumann's partnership, or through it, all the goods in question here. The transactions originated during a visit by Mr. Grünberg at St. Gallen and in personal interviews between him and Leumann. Leumann, as the representative of his partnership, received the orders,

and saw to it that they were properly filled, and that the goods were properly packed and shipped, so far as it is possible for the head of a concern to do all this. It appeared that the business of Leumann, Boesch & Co. was extensive, and that they occupied a large establishment of seven stories. The merchandise alleged to have been shipped to the Glasgow Company was laid out by Schlaepfer on the fourth floor, packed in subpackages, and arranged to be shipped to the United States in the cases already referred to; the subpackages being numbered, or containing other directions, so that they would go into the proper cases suitable for shipment, each corresponding to the genuine invoices indicating what goods were shipped in each. Being thus prepared for casing, the goods were sent by Schlaepfer to the basement, where they were intended to be put into the proper cases according to the numbers already referred to. Leumann was frequently every day inspecting the goods as packed in subpackages by Schlaepfer, and prepared by him to go to the basement, and was also daily and frequently in the basement observing the final disposition of the goods there. Whoever inclosed the goods in the basement in the cases described in the indictment, and in the evidence, delivered them to the carter, who transferred them to the forwarder at St. Gallen. From that point the record loses all trace of the goods until they were received at the port of Boston. From the nature of the situation, which was not peculiar to this particular proceeding, but inherent in all like situations where there are dealings by large houses in the shipment of goods, or by large manufacturing establishments or financial establishments in reference to their affairs, it is inherently impossible that any one person should follow of his own absolute knowledge every step with reference to each particular item of merchandise or other property involved. It is also very frequently the fact that it is inherently impossible that any person should know, of his personal knowledge, exactly what goods went into the larger packages for shipment, because the general superintendent of shipments, whose duty it is to see that the goods are put into the subpackages, has, by the nature of the business, no opportunity of knowing that those particular subpackages are shipped, or in what general packages they are shipped, while the packer in immediate charge of arranging the larger packages handles what is concealed from his sight by being inclosed in smaller packages, and therefore he can have no personal knowledge of what in fact passes his hands. Here, therefore, come in the ordinary rules with reference to the presumptions arising from the course of business, which we may refer to later. At present we have no occasion to touch on them, except to explain in this general way the inherent impossibilities involved in supporting alleged facts if the presumptions arising from the ordinary course of business may not, under some circumstances, be accepted to supply what it is inherently impossible for any person to testify to from actual, specific, detailed knowledge. We are now only pointing out that, in these particulars, the United States were, at least, entitled to prove their allegations by summoning Leumann to testify so far as he had personal knowledge, by summoning Schlaepfer to testify so far as he had personal knowledge, and by summoning the packer, if they saw fit to do so, to testify so far as he had personal knowledge,

supplementing the direct proofs, if the United States deemed proper to do so, by presenting to the jury testimony or presumptions showing or suggesting that the goods which Leumann purchased for the Glasgow Company, or sold to it, were in fact received at Boston. Certainly, in order to make out a chain of events more or less complete, Leumann and Schlaepfer were each entitled to testify, and the United States were entitled to the testimony of each of them, so far as they had any personal knowledge in reference to any of the links thereof. It is plain that each of them had a very considerable amount of personal knowledge of that kind.

The charge of the court as to each expressly limited the jury to the facts that were thus within the personal knowledge of each of these witnesses. How far either of the witnesses had personal knowledge would ordinarily be a question for the jury to determine, so that, unless the record is made specific, no exception will lie with reference to this particular topic. Insurance Company v. Weide, 9 Wall. 677, 681, 19 L. Ed. 810, involved the determination of the details of a large stock of goods destroyed by fire, where the witnesses testified with the aid of what was left by the fire of the books of the insured. The testimony related to a great mass of property, involving a multitude of items, and covering a very considerable number of years, and it is given somewhat at length at page 679 of 9 Wall. [19 L. Ed. 810]. It was to the effect that the witness identified the books, that he testified that they were kept by him and his partner, that they were correct, but that he could not state from recollection the amount or value of the stock on hand at the time of the fire; and thereupon he was cross-examined. When we examine in detail the testimony of Leumann and the corresponding testimony of Schlaepfer, it will be found that any objections which can be made as to the extent of their personal knowledge are no more efficient than the objections made as to the personal knowledge of the witness in Insurance Company v. Weide. In each case the natural presumption is, as claimed by the plaintiffs in error, that there must have been a great many details as to which, in the ordinary course of business, the witness testifying could not have had personal knowledge. Nevertheless, the admission of the testimony in Insurance Company v. Weide was sustained for the reasons given by the court at page 681 of 9 Wall. [19 L. Ed. 810]. The court, referring to the point that the witness testified generally as to the correctness of the facts stated in the memorandum which he produced, observed that, if the evidence of the witness had not been satisfactory, his cross-examination should have been placed on the record. In view of the instructions to the jury to which we have referred, and in view of the fact that Leumann and Schlaepfer each testified positively that they knew certain important matters as to which they testified, it seems impracticable for an appellate court, on such a statement as we have here, to sift out the record and reverse the judgments because of a possible difference of opinion between the appellate tribunal and the trial court as to how far the evidence should have been submitted to the jury for it to determine to what extent the testimony of the witnesses in question should be accepted in accordance with the instructions we have cited. As each of the witnesses plainly had knowledge

of a part of a chain of events, and as the court had clearly instructed the jury to accept their testimony only to the extent of that personal knowledge, whatever else they apparently testified to might, unless the record was full, be taken from our consideration.

These propositions are made evident by the fact that the interrogatories which we have cited, and which, so far as we are concerned, represent the objections taken by the plaintiffs in error so far as the matter of personal knowledge is involved, cover everything in sweeping terms "regarding the character," etc., of the goods contained in the various packages. But each witness certainly knew something "regarding the character," etc., so this is so sweeping as to include facts which were clearly within the personal knowledge of the witnesses in question, even if it did include facts which were not so. These objections, therefore, are, on their face and on this record, too broad for this court to consider. The plaintiffs in error, however, undertake to illustrate, define, and limit them by referring to Schlaepfer's testimony in regard to case 111, given in the record, as illustrative of the entire class of testimony to which these objections refer on the point of knowledge. As to case 111 Schlaepfer testified that Leumann sometimes came into the shipping room once or twice a day, sometimes oftener, that he passed through and looked at the goods and looked at a dozen pairs of curtains on a pile, and inquired for whom they were; and that he had seen Leumann examine goods concerned with the Glasgow Company. He testified further as to case 111 as follows:

"Q. Now, will you tell me, looking at your memorandum to refresh your recollection, what the contents of case 111 were? A. The contents of 111—there is one lot of 106 6/10 dozens of scarfs from Mrs. Frank, bought in St. Gall, and the others are shams, scarfs and tidies."

After he gave these details the district attorney read from the invoice copybook which was used by Schlaepfer, and which we will come to again, the detailed contents of case 111, and the record says this agreed with the contents as read by the witness from the shipping book. The district attorney then proceeded to question the witness as follows:

"Q. Did you check the page at all? Did you compare them with the actual goods? A. Oh, yes; I did.

"Q. And where were the goods that are entered on that page got together? A. In the shipping room.

"Q. Who took them down to the cellar? A. The packer.

"Q. Under whose direction? A. Under my direction.

"Q. Did you see the goods when they were piled up in the shipping room? A. Yes, sir.

"Q. Did you put a slip on the goods? A. Yes, sir.

"Q. What sort of a slip was it? Describe the slip. A. A small slip, maybe about four or five inches wide and four inches high, and just the mark of the case and the number of packages. It had on it the number of the case, No. 111, and also had upon it the initials of the consignee, 'S. & D. C.,' when delivered."

Leumann testified as follows:

"A. I saw, as I stated before, in the embroidery department, all the goods, and I saw how they were put up, and how they were marked, and how they were to be packed; but I did not state, or I would not state, that I was beside the cases when these goods were packed in."

The only point the United States make in reply to the position of the plaintiffs in error as to this class of testimony is that it was for the "jury to decide how far an absolute statement in a direct examination shall be cut down by any qualification or contradiction elicited by the other side." The United States also affirm that Leumann testified that "he saw all the cases, and knew what was in the cases." If these two propositions of the United States were correct, the plaintiffs in error would never have submitted this question to us; but this proposition of law is too broad to meet the case, and this proposition of fact is misleading, because, almost in the same breath in which Leumann testified that he knew what was in the cases, he added that he could only tell what was in them when he saw the invoices, and then, referring to the invoice books, he added: "I guessed these goods were in." And again, immediately after: "These goods must have been in, as we entered them in our ledger, and got the money for them."

The shipping room where Schlaepfer did his work was in the fourth story, as we have said, from which the goods were sent down into the cellar to be packed in the cases in which they were forwarded to Boston. In view of the express and clear explanations made by Schlaepfer and Leumann as to the extent of the personal knowledge of each, the jury could not possibly have misunderstood the questions or answers put to and given by them in regard to the contents of case 111. As we have already said, Schlaepfer knew in detail exactly what was intended for that case, and what was sent to the cellar for that purpose, and that everything was marked so as to be correctly packed as intended. If Leumann did not know everything in detail as Schlaepfer did, he knew generally what was intended for case 111, and what was prepared therefor on the fourth floor, and he might have had some further knowledge in regard thereto by reason of his occasional visits to the cellar, about which he testified. Therefore, as we have said, each of them had personal knowledge of the facts to a certain extent, which so far was clearly admissible in evidence, and, with the explanations made by each of them, it is impossible that the jury could have mistaken them on that particular topic, and is quite difficult to see how the jury could have been prejudiced so far as the mere letter of their testimony went further. Of course, there may be conditions where a mass of testimony is, as a whole, so clearly prejudicial, that a sweeping objection should be accepted; but, under the existing circumstances, if the plaintiffs in error deemed themselves prejudiced by some of the sweeping statements of these witnesses, they ought to have indicated specifically, first to the trial court and then to us, what portions of the evidence should have been refused or stricken out, and wherein it was prejudicial, and in absence of their doing so, for the reasons we have given, there is no question which an appellate court can understandingly revise. This is sufficient to end this topic, so far as it relates to the proposition of the plaintiffs in error that these witnesses were permitted by the court to testify as to matters not within their own knowledge; but it may be beneficial to take later an outlook from their precise standpoint.

With reference to the objection to the use of the so-called invoice

copybooks, in the way this is presented to us it connects with the proposition which we have already discussed. To put this more definitely, it is claimed that the matters entered on them were never within the personal knowledge of Leumann, so that he could never have had any recollection in reference thereto, and therefore could not refresh his recollection by the use of those books. But it is plain, from what we have already said, that some of the things to which the invoice copybooks related were within the personal knowledge of Leumann in the strictest sense of the expression. Therefore this question is purely incidental to the one we have already discussed, and goes out from under our consideration with it.

In this connection we may refer to the following additional proposition of the plaintiffs in error, namely:

"Did the court err in allowing the witness Leumann to use a ledger for the purpose of refreshing his recollection in testifying to the number, weight, character, and price of the contents of certain cases?"

It is submitted to us that the use of the ledger was objected to because it did not appear that the entries were examined contemporaneously with the matters to which they related. Apparently what is referred to here is the fact that Leumann finally testified that the entries on the ledger were posted on the last days of the several calendar months in which the transactions occurred, so that he was refreshing his recollection from entries some of which were made nearly a month after the occurrences of the transactions. On the other hand, the United States claim that, while this objection was made at the trial, it was not covered into any assignment of error; but the assignments seem to us both broad and specific enough to reach this point.

The ledger was used for the purpose only of showing the gross prices and the payments received. It did not purport to show the character, quantity, or quality of the goods in the various packages. When the ledger was first used in connection with Leumann's testimony, a considerable number of objections was made without there being reported in the record a particle of evidence to enable us to determine the pertinency of any of them as the case then stood. The court at that time permitted the witness to refresh his recollection from the ledger, reserving to the plaintiffs in error the right to renew their objections and exceptions after cross-examination, and then to have the testimony of the witness stricken out "so far as it appeared that his testimony was not based on personal knowledge." That part of the record states that the court found that the witness examined the ledger at least once a week, which time the court deemed sufficiently near the dates to which the entries related. Then the plaintiffs in error again noted several objections, among which were the following: That the book was not shown to be of a nature competent to be used for refreshing the recollection of a witness, that it does not appear that it was kept by the witness, that it does not appear that the entries were examined contemporaneously with the matters to which they refer, and that it does not appear that the witness had personal knowledge of the entries which were made in the book.

Thereupon, the court asked one further question of the witness, whether the entries on the ledger were always made within a day or two of the transactions entered, to which the witness replied affirmatively. Later in the record follows the cross-examination of the witness, by which it appears that the witness was mistaken with reference to this particular ledger, and that the entries in it were made at the close of each calendar month. Subsequently, the ledger itself was offered in evidence, but, on objection by the plaintiffs in error, it was withdrawn. No trace is found of any renewal of any request that the testimony of the witness based on refreshing his recollection by the ledger be stricken out, and the whole about this ledger is left in such a condition that it is impossible for an appellate court to revise the action of the trial court in finding on the voir dire that the witness could not satisfactorily, and with propriety, refresh his recollection from an examination of the ledger on the only points to which it referred, namely, the gross amounts of the invoices and the fact that payments had been received.

The law in Massachusetts on this topic, which is correctly represented by Greenleaf's Evidence (section 436), is accepted in Putnam v. United States, 162 U. S. 687, 694, 16 Sup. Ct. 923, 40 L. Ed. 1118. In the case at bar, the invoice books and ledger were offered simply for the purpose of refreshing the recollection of the witnesses. So far as the method of making the entries, the time when they were made, and the use of copies are concerned, there is a broad distinction between entries which are themselves evidence and entries which are used only for the purpose of refreshing recollection. The rules as to the former are more strict in every particular. With reference to the use of the invoice copybooks and the ledger in question, the rules as laid down by Greenleaf, and as practiced in the federal courts, are stated simply and correctly in Chase's Stephen's Digest of the Law of Evidence (2d Ed. 1898) 341 as follows:

"A witness may, while under examination, refresh his memory by referring to any writing made by himself at the time of the transaction concerning which he is questioned, or so soon afterwards that the judge considers it likely that the transaction was at that time fresh in his memory. The witness may also refer to any such writing made by any other person, and read by the witness within the time aforesaid, if when he read it he knew it to be correct.'

This contains everything essential to the use of entries for the purpose referred to. They are equally sufficient whether original, or whether, in the event of the original being destroyed or unreachable, a copy is used. The rules fix no relative dates arbitrarily, although, of course, there may be extreme instances, like that of the 20 months in Maxwell v. Wilkinson, 113 U. S. 656, 658, 5 Sup. Ct. 691, 28 L. Ed. 1037, where, under peculiar circumstances, the intervening length of time is too great to permit the trial court, even in its discretion, to allow any attempt to refresh the recollection of the witness. The rules were laid down very broadly in Insurance Company v. Weides, 14 Wall. 375, 380, 20 L. Ed. 894. There a copy was allowed to be used for the purpose of refreshing the memory of a witness, and the general proposition was stated broadly, as follows:

"If, at the time when an entry of character, quantities, or values was made, the witness knew it was correct, it is hard to see why it is not at least as reliable as the memory of the witness."

It appeared at page 377 of 14 Wall. (20 L. Ed. 894) that the entries in question were first entered on the fly-leaf of an exhausted ledger, and were afterwards transferred to the fly-leaf of a new ledger. The exhausted ledger had been destroyed, and the circumstances leave a strong implication that the date of the transfer to the new ledger was a considerable time subsequent to the original entry on the exhausted ledger. However, under the circumstances, the lapse of time, whatever it was, was not regarded by the court as important. Therefore, for this case, taking all the authorities together, the practical rule of the federal courts is simply this: Were the entries, at the time they were made, and by whomsoever made, within the cognizance of the witness under such circumstances that, when he took cognizance of them, he knew that they were correct?

Here, inasmuch as the plaintiffs in error did not avail themselves of the opportunity given them to obtain a new ruling after their cross-examination, the case stands in the way we have shown; but, even if the point had been renewed, there is nothing in the record to justify us in finding that the trial court could have held that entries, made on the ledger at the close of the month during which the transactions involved occurred, were so disconnected in time with the transactions themselves that it could have found on the voir dire that Leumann, who was the moving party in all of them, failed to recognize the truth of the entries on his ledger on account of the lapse of a period of less than a calendar month. In any view, therefore, of the question about the ledger, there is no apparent ground which would justify an appellate tribunal in holding that that court was not justified in submitting to the jury the entire matter, including the weighing of all questions about the reliability of Leumann's recollection as to the correctness of the entries which he used in support of his testimony.

On the whole, it was inherent in the circumstances, precisely as it is inherent in the circumstances of all large business transactions of mercantile houses, manufacturing houses, or financial houses, that no person, and no series of persons, could testify from personal knowledge as to all the links in the chain. Unless, therefore, testimony of the kind we have here, so far as within the knowledge of witnesses, might be sufficient, there would be an inherent impossibility in proving for any purpose the facts of any transactions with reference to merchandise or assets of any kind going through the various stages of the business of an extensive dealer or manufacturer. In practice it never has been maintained that the law is so strict as to leave no remedy under such conditions. It cannot be questioned that, under such circumstances, if the jury took cognizance of the facts proved to be within the actual knowledge of the witnesses who testified to them, they would be justified in presuming that the various links of the transactions connected themselves with each other. This is the ordinary case which the authorities hardly deem necessary to discuss, and

which is going on every day in the eyes of numerous courts. It is illustrated by Dana v. Kemble, 19 Pick. (Mass.) 112, where the jury was authorized to find that the resident of a hotel received a letter deposited in an urn kept for the purpose at the bar of the hotel, from whence the letters were sent at frequent intervals throughout the day to the rooms of the different guests. Even in the ordinary instance where one individual testifies that a copy is a correct copy of another paper, basing his testimony on the fact that he compared it with another person holding the other, the evidence is admissible, although the person testifying might not have personally known the contents of the duplicate. It is absolutely common to bridge over such a gap.

Of course, under many circumstances, the court might be required to instruct the jury that proofs, which did not supply all the links, did not put the case beyond a reasonable doubt, especially where, otherwise than as in the proceeding at bar, the question related to a single article instead of a whole class of articles as here. That, however, is not before us at the present time. In all respects the case at bar, with reference to the testimony of Leumann and Schlaepfer, ran in the ordinary, natural course. They testified as to the details of the merchandise in question, but, at the same time, they explained why and how they believed that it was distributed between the packages shipped to the Glasgow Company in the manner claimed by the United States, and this in the way we have pointed out. The court, also, was careful to instruct the jury particularly as to the rule with reference to facts within the knowledge of each of the two witnesses. From the facts which were within their knowledge, testified to by them as such, and from the other facts appearing in the case, the jury were authorized to find, if they deemed it proper so to do, that the merchandise ordered by the Glasgow Company, and of the qualities and values as ordered by them, was the merchandise which was entered at the customs at Boston. The fact that they testified that they knew in certain particulars more than they could possibly have known in the strict sense of the term "personal knowledge," was only the natural expression of witnesses under all like circumstances, as we have seen it was explained by the witnesses themselves, and as to which the court so cautioned the jury that they must have understood in reference thereto. All this clearly meant only that the witnesses only assumed to know what, after hearing the facts within their personal knowledge, the jury knew in the same way that the witnesses knew it; that is to say, that the presumptions that the merchandise followed along in the natural business channels were so strong that they were prima facie sufficient to take the place of actual knowledge. There is nothing in all this which could have improperly influenced the jury or prejudiced the plaintiffs in error. Of course, our observations are mostly limited to cases where, from the nature of things, it is impracticable to offer better evidence according to the inherent impossibility which exists at bar. They relate especially to the writs of error at bar, however, because they illustrate the peculiar necessity, resting on the plaintiffs in error under the special circumstances, of first pointing out specifically to the trial court the particulars in regard to which

they claim the witnesses in question failed of personal knowledge, and of bringing before us these particulars as they had presented them below, with the specific rulings thereon.

One other point remains to be considered which affects all of the plaintiffs in error, that is to say: The indictment alleges that the conspiracy was to defraud the United States of moneys thereafter coming due from the Glasgow Company. The merchandise in question was consigned to the Stone & Downer Company, the customs brokers, and they entered the goods at the customs and paid what duties were paid; but they were consigned to them only for that purpose, and the goods unquestionably belonged to the Glasgow Company. It is said that there is a variance from the indictment, because the funds to come due for the customs were to come due from the Stone & Downer Company and not from the Glasgow Company. In the eyes of the law, however, as the moneys to be paid the customs were in truth the moneys of the Glasgow Company, the allegation in the indictment is consistent with the facts as proven, although it quite likely would have been sufficient if the funds had been described as coming due from the customs brokers.

This leaves only one point which we deem it necessary to consider, and that affects only Shedd and Trafton. It is presented by the plaintiffs in error under the following phases:

"Did the District Court err in excluding the evidence on cross-examination of one George W Green, a witness called by the United States, to the effect that it was the ordinary course of business with respect to the goods of all merchants examined by the defendant Shedd for Shedd to examine one package only of a case in which the goods were all of one kind?"

"Did the District Court err in excluding the testimony of the defendants that the defendant Shedd made as careful an examination of the goods of the Glasgow Manufacturing Company as of the goods of other merchants?"

"Did the District Court err in refusing to allow the defendants to prove that it was not at all unusual for an examiner to cross off two cases of goods as indicating that the examination thereof had been made when only one case had been examined?"

These interrogatories connect with the twenty-eighth, twenty-ninth, and thirtieth alleged errors as assigned by the plaintiffs in error. The first two interrogatories explain themselves, but the third one is said to have grown out of the following circumstances:

Green was called by the United States. He testified that he was the opener and packer for Shedd as an examiner. In regard to cases 271 and 272, Green testified that, at the direction of Shedd, he opened only one, but chalked both with the mark that they had been examined and passed. On cross-examination he testified that he was not surprised because Shedd told him to cross off both cases. Then was put the further question as follows: "That was not at all unusual, was it?" This was objected to by the United States and ruled out. After it was ruled out, counsel stated that he expected to prove by Green that this was not at all unusual in a case of importations for any person whomsoever. The court then said: "So I suppose. I think your rights are fully protected, and your exception is noted." The proposition as now put by the plaintiffs in error in regard to these two packages 271 and 272 used the expression "an examiner." This ex-

pression is not found in the record or in the assignment of error, which was No. 30.   Neither states specifically whether the inquiry concerned examiners generally or was limited to Shedd, and, as Green's testimony is put into the record by piecemeal without regard to the order in which it was drawn out, it is impossible for us to ascertain certainly what the court understood in regard to this particular.   If the record had taken the trouble to state why the question was objected to, and why it was ruled out, we would have been exactly informed, as we should have been, what was intended.   We also understand that it developed that Green had no knowledge of the practice of examiners generally, so that all attempted proof by him in that direction was necessarily excluded.   Consequently, we must conclude to regard alleged error 30 as in line with alleged errors 28 and 29, and therefore we will leave the three grouped as we have put them.

The record with reference to the other two questions, representing the twenty-eighth and twenty-ninth errors assigned, is confused.   The testimony of Green, on which these questions turn, appears three times. Apparently, to some considerable extent, it is the same evidence repeated.   Green had testified on cross-examination that Shedd always made a thorough examination.   Then, so far as we understand, the record followed on cross-examination what will be hereinafter stated. As first printed, no objections appeared, there were no rulings of the court, and the questions seem to have been put and answered.   The brief of the United States refers to this part of the record by page, but it does not refer to the second portion where the same matter seems to have been reprinted more fully.   Thereupon, the United States say that it appears from the record that the question and answer alleged in the twenty-eighth error, assigned to have been excluded, were asked and given twice, that the answer desired went to the jury and could have been argued, and that it was not error to refuse to allow the witness to answer anew a question which had been put to him and answered before.   This is all that is said by the United States about either the twenty-eighth or the twenty-ninth errors assigned, and all we have from them about the thirtieth is to the effect that the evidence offered had no tendency to rebut the inference of fraud, but tended to confirm it.

Green testified on cross-examination as we have already said.   Then counsel for Shedd observed that this was not exactly what he wanted to know, and that he wished it a little more definite.   Then the following occurred:

"Q. How many packages, in the ordinary course of business, does he examine in that case?   A. If the whole case is of one kind of goods, all he would need to see would be one package, if the count was right, if the right number of packages was there.

"Q. All he does, in the ordinary course of business, if the goods are all of one kind in a case, is to examine one package?   A. Yes, sir.

"Q. And that is the ordinary course of business with respect to the goods of all merchants?   A. Yes, sir."

The district attorney then said:   "I submit that that is immaterial." The court replied as follows:   "It seems to me that it is.   What is the usual course of business—what has that got to do with the issues that we are trying?"   Then counsel for Shedd replied as follows:   "The

main question in this case is Mr. Shedd's good faith. If in this case he made as careful an examination as he made with reference to the goods of all the other merchants of Boston, that certainly has some bearing on his good faith." Then the court said as follows: "I think I must exclude the question and save your exception." No question was then pending, so that this, of course, referred back to those already answered, and amounted to striking out the questions and answers. If this was in the presence of the jury, as no doubt it was, the jury must have so understood it. Thereupon, Mr. Jones, who was particularly the counsel for the Glasgow Company, said that this was a matter in which he had an interest, and, after having an exception saved for his clients, he developed the proposition more fully. He called the attention of the court to the fact that the United States had put in the routine of business at the customhouse, which was the fact. He observed that the case involved a conspiracy between Shedd, Trafton, and other parties, an element of which was a corrupt failure on the part of Shedd to do his duty. Then the counsel continued: "Now, that being so, if it should appear in this case that the goods were subjected to the usual examination in which the goods of all the importers under similar circumstances were subjected, it seems to me that the inference is not only material, but important." The court replied: "It does not seem to me so, so far as Mr. Shedd's method of examination goes." It is important to notice that the court thus sharply brought back the issue to Mr. Shedd's methods as distinguished from the issues just stated by Mr. Jones, which might or might not be understood as relating to examiners generally. Thereupon the district attorney observed that he did object to the question. Then the matter was restated quite fully by Mr. Jones, with a full explanation of the evidence expected to be drawn out, claiming that it related to the routine of business. Thereupon the court again made it clear that it understood the testimony offered related to the method pursued by Mr. Shedd. The court said: "I do not conceive that this is much of an offer, to begin with. This is an offer to show how one particular examiner was in the habit of examining goods. That is not the routine of business in the ordinary sense of the words." That conversation was ended by the court's saying: "I will exclude it and save your exceptions." Then some questions followed of a broader character with reference to the practice of examiners generally, which were ruled out on the ground that the witness had not sufficient personal knowledge in reference to the matter to testify in regard thereto. The record does not show that any exceptions were saved on the particular point as to the practice of examiners generally.

There seems to be no fair question on the substantial point as to which the exceptions were reserved; that is, whether the court erred in excluding testimony tending to show that Shedd proceeded with the merchandise in question according to his usual methods with merchandise generally. It all comes down to the matter of Shedd's usual or frequent method of conducting examinations of merchandise, though, as we will see, the result would be the same even if the question was that of the usual method of examiners generally. It should, however, be said, as bearing on this question to some extent, that Shedd

testified that Grünberg represented that he was in a great hurry for cases 271 and 272, and it also appeared that the number of cases of merchandise examined by Shedd and Trafton ran into many thousands: Shedd testifying that he examined in nine months 10,447 packages. Shedd and Trafton both testified as witnesses, and, of course, denied all unlawful intent, although none of the members of the Glasgow Company took the stand.

In view of the fact that the issue in regard to Shedd and Trafton was of the kind which we have said, that is, one of intention, and not one of negligence, and in view, also, of the fact of the great number of packages which they examined, it is true that, under many circum-stances, everything tending to show that they were usually negligent, or that they practically and usually construed their duties as requiring them to do what they did with reference to the goods in question as proposed to be shown, or tending to show that their usual methods were hasty or insufficient on account of the immense amount of merchandise required to be examined, or for any other reason, would have been of the utmost importance for the defense of those two men, and so important that it might have been the only way of showing that, after all, there was no guilty intent. But the plaintiffs in error have failed to bring to our attention here any circumstances which show that the question proposed to Green was material. They say that it was material because, as Green had testified that Shedd only examined one package in a large case of goods, the jury might well infer that an examination of such a perfunctory character was fraudulent, and that therefore Shedd had a right to rebut this inference. This testimony, however, was not a part of the case of the United States, or relied on by them, but was called out by Shedd himself on cross-examination, as we have shown. Of course, none of the plaintiffs in error could raise a presumption for the sake of rebutting it. It is true there often are circumstances under which a party, who, on cross-examination, has brought out an unexpected fact, may be allowed to rebut it, and should be allowed to do so; but an instance of this character should not be permitted to jeopardize a verdict unless the grounds therefor are fully stated. As this proceeding stands it is not in that condition. The plaintiffs in error have not shown us that the question whether or not Shedd might examine more than one package out of one of these cases was, at the stage of the trial when this topic arose, at all material. On the other hand, to the extent disclosed to us by the record, it was not material. One package would have shown as much as an examination of the entire case in which the goods were shipped would have shown, and vice versa. As we stated at the outset, the claim made by the United States was not that there was an intermixture of honest and fraudulent goods in the same shipping case, which could be sifted out only by a complete examination; but it exhibited a uniformity of high grades throughout imported, with a uniformity of invoicing throughout as of low grades, so that an examination of a single package would have developed the nature of the fraud as conclusively as an examination of the entire contents of any case in which the goods were shipped. However this may be, the plaintiffs in error have failed to develop to us such a condition of materiality, as under the circumstances they

were clearly bound to do, as would justify us in reversing the trial court because it did not authorize them or either of them to follow up this matter incidentally developed by their own cross-examination of a witness of the United States.

This same general line of observation disposes of alleged error 30 as to cases 271 and 272, as the plaintiffs in error have failed to make clear that it is material. There is no claim on the part of Shedd that the fact that he examined only one case was other than exceptional, and he explains this fact because, as he says, Grünberg was in haste for both of them. The evidence offered might have been of importance if it had transpired that the case which was examined corresponded with the invoices, while the case which was not examined did not; but, inasmuch as neither so corresponded, the fact that circumstances induced him to omit the examination of only one case becomes wholly unimportant, and has no probative force.

On each writ of error the judgment will be the same, as follows: The judgment of the District Court is affirmed.