## UNITED STATES v. ROLLNICK et al.
### No. 400.

Circuit Court of Appeals, Second Circuit.
Aug. 16, 1937.

David G. Haskins, of New York City (Samuel H. Kaufman and Eugene M. Parter, both of New York City, of counsel), for appellant Rollnick.

Emanuel Harris, of New York City, for appellant Werblin.

Paul J. McCauley, of New York City (Harold L. Fisher, of New York City, of counsel), for appellant Marshall Ward.

Robert P. Levis, of New York City, for appellant Herbert Smiler.

Jesse B. Messitte, of New York City, for appellant Samuel Halpert.

Godfrey & Marx, of New York City (Walter E. Godfrey, of New York City, of counsel), for appellant Gold.

Irving Spieler, of New York City (Ben Herzberg and Edward J. Ross, both of New York City, of counsel), for appellant Theodore Tetelman (Baldwin).

William J. Millard and Samuel L. Miller, both of New York City, for appellant Steinberg.

Raphael L. Elias, of New York City, for appellant Manchel.

Lamar Hardy, U. S. Atty., of New York City (Leo C. Fennelly and Richard J. Burke, Asst. U. S. Attys., and Frank H. Gordon, Sp. Asst. to U. S. Atty., all of New York City, of counsel), for the United States.

Before MANTON, SWAN, and CHASE, Circuit Judges.

**CHASE, Circuit Judge.**

The indictment contained nineteen substantive counts, in each of which was alleged a separate use of the United States mails in furtherance of a scheme to defraud and an additional count 20 in which a conspiracy to defraud by using the mails was alleged. On motion at the close of the evidence of the prosecution, count 5 was dismissed as to all the defendants and counts 4, 10 and 12 as to appellants Baldwin and Steinberg. Before the trial began, a severance was granted as to defendants Straus, Hennigan, and Dinter. The first two, consequently, were not tried and Dinter, after pleading guilty, testified at the call of the government. All of the defendants tried, except Lazar and Schwartz as to whom the jury disagreed, were convicted and sentenced on all the counts left in the case as to them. Levin, however, received a suspended sentence and has not appealed. Berman was resentenced after the first sentence was imposed upon him. He attempted to appeal each time, and both his appeals were dismissed before this cause came on for argument.

The scheme to defraud, in which the use of the mails was clearly shown, developed out of opportunities which were seized upon by the conspirators to sell watered stock which they succeeded in getting listed and keeping listed for a time on the New York Produce Exchange.

Rollnick was a promoter. In February, 1932, he caused a Delaware corporation, called the National Investment Transcript, Inc., to be organized for the publication of a financial newspaper. It started publication at 23 Broadway in Camden, N. J., on April 14, 1932, with appellant Congdon, an elderly man of previous experience as a financial writer, as editor, and continued publication as a weekly until about the middle of September, 1934. Until Rollnick became interested in the scheme to sell the stock herein involved, it seems that National Investment Transcript, Inc., devoted its attention to the building up of a circulation of about 15,000 subscribers at $10 per year and to attempting to gain their good will and that of the public. Rollnick was accustomed to read the proofs of the paper before publication and to keep in touch with what Congdon did in its management. Appellant Smiler was the treasurer, acting under the alias of "Samuel Harris," until appellant Manchel succeeded him in April, 1933, in that office. Thereafter Smiler was continued on as office manager and known as "Mr. Herbert." Other persons under aliases were employed, some perhaps using such names for reasons of their own, but some at least doing so to prevent their previous connection with Rollnick being an indication that he had to do with National Investment Transcript, Inc. After the paper had been published some months, it began a build-up of interest in low-priced stocks, using questions prepared by Rollnick which purported to come from subscribers and were printed and answered by the paper in its columns. This continued into March, 1933, and included warnings against the textile industry as a field for investment until a little later when the scheme with which this prosecution is concerned was ripe for treatment and the paper became a full-fledged tipster sheet in respect to it and more as will be seen presently.

Defendant Levin had been for many years engaged in the textile business. In 1929 he became a pioneer in selling rayon goods on commission under the trade name of S. Levin & Co. His business requiring additional sources of supply, in 1930 he decided to engage in the manufacture of rayon and to that end organized, with the aid of Norfolk citizens, a corporation known as Norfolk Weavers,

Inc., which took over a closed silk mill in Norfolk, Va., and began operations. Levin subscribed to the class B preferred stock to the amount of $20,000 and invested additional money in machinery and equipment. This venture was apparently soundly financed and profitably operated. Levin, needing still more manufactured rayon to meet his sales requirements, organized College Weavers, Inc., which took over, in March, 1932, another closed silk mill; this time in Northampton, Mass. He invested $55,000 and acquired all of its capital stock. Finding that he required more prepared rayon yarn than could readily be obtained, Levin soon organized another corporation called College Throwsters, Inc., all of whose capital stock he took over. That corporation leased a mill in Haydenville, Mass., whose capacity was enlarged and it began spinning rayon yarn to its production limit. The business Levin was building up was then further expanded by the addition of two corporations in Michigan known as Beldray Industries and Beldray Throwsters into which he put more of his money. By this time, however, Levin had about reached the end of his ability to increase his investment and, though his business was apparently such as to justify the expansion, that required more capital than he could readily supply. He then consulted one Caiden, a wholesaler in silks, and appellant Werblin. They brought him into touch with appellant Rollnick and one Vance who had been the president of a bank in Philadelphia and was considering entering the investment banking business himself.

At the instigation of Rollnick, the First Continental Corporation was organized to acquire the title to the real estate leased or owned by Levin, or the corporations he controlled, as well as some other property; the scheme being to transfer everything to a holding company in exchange for its stock and to sell that through the market operations which followed. Vance became the president of First Continental Corporation which was dominated by Rollnick.

According to plan, Rayon Industries Corporation, the holding company, was organized on May 20, 1933, having capital stock of 1,500,000 shares of the par value of $1 divided into two classes. Class A, consisting of 1,000,000 shares, was entitled to prior noncumulative dividends of 10 per cent. of par, and class B, consisting of 500,000 shares, was entitled to share equally with class A in any surplus available for dividends.

The details of the manipulation of properties and stock need not be stated. It is enough for present purposes to know that the contemplated transfers were made so that even when the really substantial assets in the Levin business were put into the pot the stock of the holding company was of a par value so much in excess of the value behind it that it represented a great deal of water. Only unwarranted optimism could arrive at any other conclusion and an appraisal made by Ford, Bacon & Davis, an unquestionably reputable concern in that business, lends no real support to a contrary view, though the figures set up were used for such a purpose. Indeed, although Ford, Bacon & Davis had been employed to make both an appraisal and a report on the business, the request for a business report was withdrawn after preliminary investigation indicated that it would show expected earnings of Rayon Industries Corporation much less than would meet the needs of Rollnick and his confederates in the scheme to sell the stock.

The stock of the holding company was acquired in accordance with the promotional contract, as modified, by Levin and First Continental. For the properties he transferred to the corporation Levin received 500,000 shares of class A stock which he donated to the treasury of the company, 500,000 shares of class B stock, and 75,000 shares of class A in lieu of $150,000 in cash which was to be paid him under the original terms. As a further consideration, now of little moment, he was to be employed for three years as general manager of Rayon Industries Corporation at an annual salary of $24,-000. First Continental Corporation agreed to turn over to the holding company the Levin properties and stock it had and to purchase from it the 425,000 shares of treasury stock and the 75,000 shares from Levin at $2 per share, in addition to which it was to receive the remaining 500,000 shares of class A stock, putting it in position to dispose of the entire issue of 1,-000,000 shares through the contemplated selling operations.

No money was actually paid by First Continental Corporation for the stock until after receipt of the proceeds of the public offering which was brought about through the action of Marshall Ward &

Co., a New York brokerage firm of which appellant Marshall Ward was the man in control; Patton & Co., Inc., a Philadelphia company organized and financed by Rollnick to act as the broker for his National Investment Transcript, Inc., and of appellant Congdon, who touted the stock through the columns of the National Investment Transcript and in two brochures which he either wrote or helped write.

Marshall Ward, as Marshall Ward & Co., agreed to buy 500,000 shares of class A stock from First Continental Corporation at $2.25 per share, of which 25 cents per share was to be paid to Caiden and appellant Werblin as a finder's fee. Patton & Co., Inc., agreed to take all of the stock it could sell from Marshall Ward & Co. on the basis of an equal division between it and Marshall Ward & Co. of any profits or losses resulting from sales. It also agreed to reserve a large amount of stock for appellant Manchel for distribution to such subscribers of National Investment Transcript as could be induced to buy on its recommendation and for its efforts in creating a demand for the stock the Transcript was given an option on 50,-000 shares at $3 per share.

Marshall Ward & Co. advertised a public offering of the stock in about thirty newspapers and sold it largely through Patton & Co., Inc., and the National Investment Transcript though it sold a substantial amount directly to its own customers. On July 1, 1933, Marshall Ward & Co. purchased by contract an additional 500,000 shares of class A stock from First Continental Corporation at the former price of $2.25 a share, and on July 17, 1933, the entire issue was listed on the New York Produce Exchange. To secure the listing, it was necessary to make provision for setting up a special mortgage fund to the amount of $155,250 to assure the payment of mortgages on the property which had been turned over to Rayon Industries Corporation, and on August 6, 1933 such a fund to the amount of $77,-625 was established in the Continental Bank & Trust Company. No part of it, however, was ever used for the payment of the mortgages, but it was within a few months otherwise spent under Rollnick's direction.

First Continental Corporation, which was used as a blind for Rollnick, had no paid-in capital but did make large profits through its sales of stock to Marshall Ward & Co. as part of the procedure whereby the stock was sold to the public, and these profits were turned over to Rollnick or to others at his direction.

When these conspirators were ready to let the public in on the sale of the stock after it had been touted by Congdon in the National Investment Transcript, what is called a "boiler room" was set up in the Transcript office at 23 Broadway, Camden, N. J., where high-pressure salesmen were employed and began selling the stock over the telephone. Appellants Halpert, Greene, Gold, Baldwin, and Steinberg were among those who acted as such salesmen. That they well knew they were engaged in fraudulent stock selling it is clear from the record. Appellant Manchel worked with some of them at times, though he with Congdon and Smiler are more properly to be considered directors of the enterprise than salesmen. They all knew what was being done and helped the business on.

Telephone conversations with customers or prospective customers were all carried on in the name of Congdon, the salesmen being instructed to and succeeding in so speaking that victims believed they were talking with Congdon when in fact they were talking to any of the salesmen. Each salesman had a number from 1 to 7, as shown by Ex. 20, by which card records of sales made were at first kept. Later such records were kept in a book introduced as Exhibit 33 with the salesmen's number showing commissions earned. Halpert and Greene also sold the stock after September, 1933, by telephone from offices in Philadelphia, and Baldwin and Steinberg similarly sold it from the office of Marshall Ward & Co. in New York.

While many false and misleading representations were made in the sale of the stock, a few will suffice for present purposes. One of them, which was palpably false and obviously material, was that Rayon Industries Corporation was making profits. Others, also knowingly false and useful in persuading victims to buy, were that Ward was not connected with Congdon; that Congdon was adding to his personal holdings; that the Celanese Corporation would merge with Rayon Industries Corporation; that the latter would declare a dividend of $2.50 per share; and more in like vein.

Over the protest of Levin, Rollnick had Rayon Industries Corporation declare

a dividend of 2½ cents a share on September 26, 1933, payable November 1, 1933, which was paid and charged to capital surplus account, despite actual substantial net losses from its organization up to December 31, 1933. Another dividend of like amount was declared on January 13, 1934, payable February 1, 1934, in the same way, notwithstanding continued losses.

The activities of these men in selling the stock as they did were investigated by the New York Attorney General in June, 1933, without disclosure of the fraud. They were also investigated by the Attorney General of New Jersey and in January, 1934, a temporary injunction was issued against the Transcript. But, notwithstanding these deterrents, the scheme was carried on with the price of the stock steadily rising on the market until on September 15, 1934, it was stricken from the Produce Exchange. Marshall Ward had manipulated the market with buying and selling orders with the aid of brokers acting under his direction, so that the close would be at the high price each day, and on September 14, 1934, it closed at the all time high of 9⅝, which was at Ward's offering price. For about two days there had been some short selling which was traced to a man in Boston named Jarvis, an acquaintance of Rollnick, who had overheard conversation on a golf course indicating that the Securities and Exchange Commission was considering taking some repressive action regarding the selling of Rayon Industries Corporation stock. On September 14, 1934, it did file a bill of complaint in the United States District Court for the District of New Jersey against National Investment Transcript, Inc., Congdon and Ward, both individually and under the trade-name of Marshall Ward & Co. This resulted in a decree, consented to by all those defendants, being issued on September 24, 1934, permanently restraining them, inter alia, from selling or attempting to sell Rayon Industries Corporation class A stock or any other securities by "using any means or instrument of transportation or communication in interstate commerce" and by using the mails to defraud. One result of the filing of the bill was that on September 15, 1934, Marshall Ward failed to support the stock and its price dropped to almost nothing without any more sales on the exchange.

The knowing participation of all the appellants, except Werblin, in the fraudulent scheme to defraud was made too plain to the jury by the evidence to justify any doubt of their guilt. While the guilty knowledge of Werblin was not quite so completely proved, we think there was enough to warrant the jury in finding him guilty beyond any reasonable doubt. He did not, to be sure, actively participate in the actual sales of the stock after he introduced Levin to Rollnick, but he did share in the money fraudulently obtained when he took the part of the "finder's fee" paid to him to the extent of $92,500, some of it as late as July, 1934. His guilty knowledge of the fraud in the proceeds of which he continued to share is shown by his false statements to the United States attorney in April, 1934, to the effect that, though he knew Rollnick, he did not know him "on this deal" (meaning the Rayon Industries Corporation matter). When asked, "Do you know if Rollnick has any interest on this deal?" he answered, "I would like to know. I may have my suspicions. I don't know." And he further falsely denied that he participated "in any conference in Philadelphia regarding this matter." The jury had a right to treat this as Werblin's contribution to the conspiracy then being actively carried on and whose fruits he was sharing by falsely covering up Rollnick's connection with it and in that way trying to prevent exposure of the fraud. So we find no lack of evidence to support the verdict as to any appellant.

Some claimed errors in the trial urged as cause for reversal require discussion. For the first time in this court, the content of the indictment is attacked but on grounds quite untenable in view of what we have already said in United States v. Brown (C.C.A.) 73 F.(2d) 309; United States v. Shurtleff (C.C.A.) 43 F.(2d) 944; and Silkworth v. United States (C.C.A.) 10 F.(2d) 711.

Appellants Congdon and Manchel were represented only by counsel appointed by the court who assigned the trial lawyer who represented Rollnick to act for them. They then did not object but accepted his services and, having done so, cannot now complain. Cf. Henry Ching v. United States (C.C.A.) 264 F. 639. The attorney was familiar with the case, and any suggestion that there was a conflict of interest is an absurd afterthought.

Fault is found with the opening address of the prosecutor to the jury in that he said in referring to those named in the indictment that one of them had pleaded guilty that morning. This was objected to and the jury at once instructed to disregard it. The man referred to was Dinter, who, when he subsequently testified, was cross-examined as to his plea so that any claim of prejudice to others from the fact that the jury knew he had pleaded guilty is hardly chargeable to the prosecutor alone. But at any rate we think there was no reversible error. Had Dinter been brought into court and pleaded guilty in the presence of the jury, none of the other defendants could have successfully objected. Grunberg v. United States (C. C.A.) 145 F. 81. The immediate direction of the court to the jury made it unnecessary in any event to declare a mistrial then, and, as the fact of the plea of guilty was later brought out in cross-examination, there is no cause now whatever for charging the prosecutor with reversible error. Nor has error been shown in respect to the summation wherein it was stated that he believed certain numbers mentioned had been assigned to certain named salesmen. Steinberg was included as having been assigned No. 5 to which his counsel then objected. The court, however, cautioned the jury "to disregard the statements of counsel as to the testimony and follow your own recollection." Moreover, Steinberg was certainly one of the salesmen and what prejudice could result from the prosecutor's stating that he believed his number was 5 is beyond comprehension. He had some number, and nothing now turns upon whether it was 5 or some other. The objection made by appellant Halpert regarding the argument that he had told Dinter how to sell the stock on July 30, 1934, as Dinter testified is equally frivolous. There was a dispute about it, and the attorney might well argue as he did in support of his contention that Dinter was right.

During a long and rather involved trial of many defendants together, the court admitted a good deal of evidence which was limited to certain defendants when admitted upon the understanding that, if it later became admissible as to others, the government could move to have it so treated. It was also received subject to the right of any defendant to move to have the evidence stricken out. Much of it depended as to general admissibility upon whether the conspiracy charged should be proved. At the close of the case for the government, the prosecutor moved that all the evidence be treated as admitted against all defendants except such as had been offered only against particular ones. This motion was argued and considered in the absence of the jury, with the result that the court decided not to grant the motion but to instruct the jury in its charge as to the use to be made of the evidence. This was done without exception by any defendant, and no requests in respect to this subject were made. We can find no error in what the court did. On the contrary, it was substantially in accord with the practice approved in Van Riper v. United States (C.C.A.) 13 F.(2d) 961. We are not to assume gratuitously that the jury disregarded the court's instructions and made improper use of the evidence admitted. Coplin v. United States (C.C.A.) 88 F. (2d) 652.

Especial emphasis is now put on the claimed error in the reception of Government's Exhibit 173. It was a balance sheet showing operating losses sustained by Rayon Industries Corporation and its subsidiaries during 1933 and 1934 up to the end of June as of which time it was made up. Levin had sent it to stockholders together with a circular, Exhibit H-4, dated October 23, 1934, wherein an explanation of the losses was given. The defendants had offered H-4 which had been excluded on objection by the government as self-serving. When Exhibit 173 was offered objections were made but were withdrawn upon the condition that the government's attorney would offer both H-4 and 173 in evidence. He did so and they were received, H-4 becoming Government's Exhibit 205. Then the attempt was made to have the admission of 173 limited and its final reception was against defendant Levin. It clearly was admissible against Levin, who sent it out as an inclosure in the letter (Exhibit 205) signed by him for the information of stockholders. If the conspiracy had not then ended, it was, of course, admissible as against all the conspirators. There was evidence indicating that the conspiracy had been broken up by the attack of the Securities and Exchange Commission in the New Jersey suit against some of the conspirators which resulted in the consent decree mentioned with the attendant practical difficulty of carrying it out successfully after the stock had been

made unsalable on the exchange and had dropped to almost nothing in price. But a conspiracy is a partnership agreement having crime as the partnership business done by overt acts. Difficulty of accomplishment is not conclusive of the end of the agreement to act in concert. An overt act like this of Levin's to explain losses and attempt to convince stockholders that their investment was good despite what had happened may well have been considered by the jury as proof of the determination of the partners in crime to continue on as best they could. When once a conspiracy is shown to exist which in its nature is not ended merely by lapse of time, it continues to exist until there is shown some affirmative act of termination. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas. 1914A, 614; Coates v. United States (C. C.A.) 59 F.(2d) 173.

Exhibit 205 contained the following among other indications of an attempt to carry on the scheme: "While this publicity naturally did not tend to help the company, the operations of the company are not likely to be interfered with. Property valuations have not been affected, and our program is going forward without interruption. The company will take all necessary steps to endeavor to have the stock registered with the Securities and Exchange Commission." The consent decree in New Jersey against some of the defendants was, indeed, some evidence that they had withdrawn but, as the jury had seen that the previous New Jersey injunction against some of them had not stopped the carrying out of the conspiracy, it might well have thought that here again there was but a bending to the wind while it was blowing. Besides that, other evidence in the case established the fact of losses incurred instead of net profits made during the two periods, and so the falsity of the net profits representations made by the conspirators in selling the stock is at any rate clear.

■■■ The objection to the admission of government's Exhibit 285 is also unavailing. It was the New Jersey consent decree. Defendant Ward had introduced in evidence Exhibit P–5, the order to show cause in the suit which had been served on him, and the subject of that suit having been opened in evidence it was permissible for the government to show the outcome of the service of the show cause order. See Vause v. United States (C.C.A.) 53 F. (2d) 346. The reception was limited to the defendants named in the decree. So also was government's Exhibit 281, Levin's income tax return for 1933, properly received limited as it was to proof against him. See Lewy v. United States (C.C.A.) 29 F.(2d) 462, 62 A.L.R. 388.

■■■ Some of the appellants contend that section 215 of the Criminal Code (18 U.S.C.A. § 338) under which the indictment was drawn was repealed by implication by the Securities Act of 1933 (48 Stat. 74, 15 U.S.C.A. § 77a et seq.). The latter act did cover in part the fraudulent use of the mails, but in that respect did not include all schemes to defraud by their use. The Securities Act of 1933 was made sufficiently comprehensive to include the use of the mails among the acts prohibited in respect to its subject matter, but that this shows an intent on the part of Congress to repeal section 215 and make lawful the use of the mails in furtherance of fraud of a nature not covered in the Securities Act of 1933 seems too far-fetched for serious discussion. These laws are not repugnant, and it must be remembered that repeal by implication follows only where the later act is clearly intended to be in substitution of the former. As was recently said in United States v. Burroughs, 289 U.S. 159, 53 S.Ct. 574, 577, 77 L.Ed. 1096: "Implied repeals are not favored, and if effect can reasonably be given to both statutes the presumption is that the earlier is intended to remain in force." See also, Blumenthal v. United States (C.C.A.) 88 F.(2d) 522.

Several other exceptions have been urged, examined, and found to be without merit. Indeed, they are all of the kind that may be classed as straw grasping that so often tend but to obscure what substantial points may be raised. We are convinced from a study of the record that all the appellants were fairly tried and justly convicted.

Judgment affirmed.