**UNITED STATES of America, Plaintiff,**

v.

**Alan Herbert ABRAHAMS, a/k/a James A. Carr, Defendant.**

No. 79 Crim. 425 (WCC).

United States District Court,
S. D. New York.

Feb. 25, 1980.

As Amended June 11, 1980.

the issue presented by the Court of Appeals mandate.

Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, New York City, for the United States of America; Michael A. Collora, Sp. Asst. U. S. Atty., District of Massachusetts, Boston, Mass., of counsel.

Alan Herbert Abrahams, pro se.

## OPINION AND ORDER

CONNER, District Judge:

Defendant Alan Herbert Abrahams ("Abrahams") is charged with one count of violating the conspiracy statute, 18 U.S.C. § 371, and forty-nine counts of violating the mail fraud and wire fraud statutes, 18

U.S.C. §§ 1341 and 1343, respectively.[1] The charges arise out of his operation, between July 1, 1976 and January 15, 1978, of Lloyd, Carr & Company, which was in the business of offering to the public options to purchase or sell futures contracts[2] on commodities traded on markets in London, England. In Count One of the indictment, the Government charges that Abrahams knowingly engaged in a conspiracy to obtain money by means of a scheme to defraud investors by employing such techniques as selling "naked" options[3] to the public; representing to customers that Lloyd, Carr & Company would purchase options for them when in fact such options were never purchased; disseminating false and misleading recommendations respecting commodity options to the public; and employing unskilled salespersons who were encouraged to use high pressure techniques to sell options to the public. Sixty-seven overt acts are set out in Count One; most allege that defendant sold an option to an individual on a particular date utilizing these techniques. Counts Two through Fifty charge defendant with mail fraud or wire fraud:[4] the Government alleges that having devised the scheme to defraud the public set out in Count One, defendant then utilized the mails and the wires to send confirmations of purchases of options to customers and to place orders for the purchase of options for Lloyd, Carr & Company customers.

Abrahams moves to dismiss the indictment on several grounds: (1) that he is being prosecuted under the wrong criminal statute; (2) that he is being selectively prosecuted; (3) that he has been prejudiced by pre-indictment publicity; (4) that prosecutorial misconduct occurred before the

Grand Jury; and (5) that his right to a speedy trial has been violated.

I. Exclusive Jurisdiction

A. The Contentions of the Parties

■ Abrahams contends that for federal prosecutions for mail and wire fraud involving commodity options, the exclusive vehicle is the Commodity Futures Trading Commission Act of 1974 ("the Act"), Pub.L.No. 93–463, 88 Stat. 1389 (1974), *as amended by* Pub.L.No. 95–405, 92 Stat. 865 (1978), *codified at* 7 U.S.C. § 1 *et seq.* (Supp.1978); that by its enactment Congress intended that commodity options would be regulated solely under the Act; and that Congress implicitly repealed those provisions of other, more general statutes, including the mail and wire fraud statutes, imposing penalties for conduct now proscribed as criminal under the Act. Defendant relies on the wording of Section 2 of the Act which provides in relevant part:

" * * * That the Commission shall have exclusive jurisdiction with respect to accounts, agreements, (including any transaction which is of the character of, or is commonly known to the trade as, an 'option,' 'privilege,' 'indemnity,' 'bid,' 'offer,' 'put,' 'call,' 'advance guaranty' or 'decline guaranty') and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to Section 7 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to Section 23 of this title; *And provided further*, That, except as hereinabove provided, nothing contained in this section shall (i) supersede or

1. The Government has recently submitted to the Court and defendant a revised indictment on which it plans to proceed to trial. The revised indictment contains 21 fewer overt acts in Count One and 20 fewer mail or wire fraud Counts.

2. A commodity option gives the right, but not the obligation, to buy or sell a fixed amount of a commodity at a certain price within a fixed period of time.

3. A "naked" option is a "type of option * * created without backing by either futures contracts or actual ownership of the commodities involved, and may be written by anyone willing to risk that he will be able to cover his obligation should the option be exercised." *Kelley v. Carr*, 442 F.Supp. 346, 349 (W.D.Mich.1977).

4. The wire fraud statute, 18 U.S.C. § 1343, is modeled after the mail fraud statute, 18 U.S.C. § 1341. The Court will discuss them collectively as the mail fraud statute.

limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State  *  *  *."

Abrahams further contends that Section 6*o* of the Act, which prohibits the use of the United States mails or any means of interstate commerce to perpetuate fraudulent schemes involving commodity options, was intended by Congress to be the sole means by which fraudulent conduct in the commodities field, including such conduct as is alleged in the instant indictment, should be prosecuted,[5] even if that conduct violates the mail fraud statute as well. Section 6*o* provides:

"(1) It shall be unlawful for any commodity trading advisor or commodity pool operator,[6] by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly

"(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

"(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.[7]"

The Government argues that neither the express wording of the Act nor its legislative history offers any support for defendant's theory that the Government is prohibited from prosecuting fraudulent schemes involving commodity options under the general criminal antifraud statutes, such as the mail fraud statute. The Government's posi-

5. Defendant contends that the conspiracy statute under which he is charged in Count 1 is preempted by Section 13c of the Act, entitled "Responsibility as principal":

"(a) Any person who  .   .   .  wilfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter  .  .  .  or who acts in combination or concert with any other person in any such violation,  .  .  . may be held responsible in administrative proceedings under this chapter for such violation as a principal."

6. "The term 'commodity trading advisor' shall mean any person who, for compensation or profit, engages in the business of advising others, either directly or through publications or writings, as to the value of commodities or as to the advisability of trading in any commodity for future delivery on or subject to the rules of any contract market, or who for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning commodities; but does not include (i) any bank or trust company, (ii) any newspaper reporter, newspaper columnist, newspaper editor, lawyer, accountant, or teacher, (iii) any floor broker or futures commission merchant, (iv) the publisher of any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation including their employees, (v) any contract market, and (vi) such other persons not within the intent of this definition as the Commission may specify by rule, regulation, or order: *Provided,* That the furnishing of such services by the foregoing persons is solely incidental to the conduct of their business or profession. The term "commodity pool operator" shall mean any person engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market, but does not include such persons not within the intent of this definition as the Commission may specify by rule or regulation or by order." 7 U.S.C. § 2 (Supp.1978).

7. Amendments made by the Futures Trading Act of 1978, Pub.L.No. 95–405, 92 Stat. 865, increased the penalty for mail and wire fraud of any kind in connection with commodities trading [*i. e.,* knowing violation of the provisions of Section 6*o* (1)] from a misdemeanor punishable by a fine of up to $100,000 or imprisonment for not more than one year, or both, together with the costs of prosecution to a felony punishable under 7 U.S.C. § 13(b) by a fine of not more than $500,000, or imprisonment for not more than five years, or both, together with the costs of prosecution.

tion is that the mail fraud statute serves as a useful supplement to the criminal anti-fraud sanctions provided by Congress in the Act and that the two statutes—Section 6o of the Act and Section 1341—work in harmony in attempting to prevent fraud and misrepresentation in the commodities field. For the reasons that follow, this Court shares the Government's view.

## B. The Applicable Law

Defendant contends that by enacting the 1974 Act—a comprehensive statutory scheme to regulate trading in futures—Congress intended to repeal, by implication, the more general mail fraud statute insofar as it relates to schemes to defraud involving futures.

■ Whether the passage of a specific law precludes prosecution under a more general law covering the same offense is a question of legislative intent.[8] The law is well settled, however, that repeal by implication is not favored and that it follows only where the later act is clearly intended to be in substitution for the earlier act. "The implication must be clear, necessary, and irresistible," *Blumenthal v. United States,* 88 F.2d 522, 526 (8th Cir. 1937); the legislative intent to repeal must be manifest in the positive repugnancy between the provisions. *United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). See also *United States v. Burroughs,* 289 U.S. 159, 164, 53 S.Ct. 574, 576,

77 L.Ed. 1096 (1933); *United States v. Green,* 494 F.2d 820, 827 (5th Cir.), *cert. denied,* 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974); *United States v. Rollnick,* 91 F.2d 911, 918 (2d Cir. 1937).

In order to determine whether the Act's specific antifraud provision should be deemed to have repealed the mail fraud statute, this Court must first examine the legislative history of the Act to determine whether Congress expressed an intent partially to repeal the mail fraud statute and, second, must examine the two statutes to determine whether there is a repugnancy in the subject matter of the two statutes which would justify an implication of repeal.

## C. Legislative History

A review of the legislative history of the Act establishes that Congress intended to vest the Commodity Futures Trading Commission ("the Commission") with exclusive jurisdiction over the *regulation* of commodity futures; however, the legislative history does not support defendant's view that Congress, by the "exclusive jurisdiction" language, intended that prosecutions for fraudulent schemes involving commodity options would lie solely under the Act.

Prior to the enactment of the 1974 Act, a number of state and federal agencies regulated trading in commodity futures: options in agricultural products were regulat-

---

8. Defendant relies on *Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978) and *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), for the proposition that where a general statute and a more specific statute speak to the same concerns, the specific statute should govern; however, those decisions are clearly distinguishable from the situation in the instant case. In *Simpson, supra,* the Court was called upon to determine the extent of punishment to which a criminal defendant is subject to for armed robbery. The Court found that Congress had not authorized the imposition of the additional penalty of 18 U.S.C. § 924(c) (use of firearms to commit a robbery) for the commission of a bank robbery with firearms already subject to enhanced punishment under 18 U.S.C. § 2113(d) (aggravated robbery—robbery committed by use of a dangerous weapon). In *Preiser, supra,* the Court held that although the broad language of 42 U.S.C. § 1983 literally encompassed respondent's request for release from imprisonment, the more specific federal habeas corpus statute was the exclusive remedy available to the prisoner "because Congress has passed a more specific act to cover that situation, and, in doing so, has provided that a state prisoner challenging his conviction must first seek relief in a state forum . . . . It would wholly frustrate explicit congressional intent to hold that respondents . . . could evade this requirement by the simple expedient of putting a different label on their pleadings." 411 U.S. at 489–90, 93 S.Ct. at 1836. In the instant case, neither the legislative history connected with the Act, nor any compelling policy reason, compels this Court to conclude that by passage of the Act, Congress meant to repeal the mail and wire fraud statutes, see discussion *infra.*

ed by the Department of Agriculture via the predecessor of the 1974 Act, the Commodity Exchange Act ("the CEA"), c. 369, § 1, 42 Stat. 998 (1922), *codified at* 7 U.S.C. § 1 *et seq.* (1964); options in securities were regulated by the Securities & Exchange Commission ("the SEC"); and various state agencies, such as the "blue sky" commissions, were also actively involved in policing the options markets. But a regulatory gap still existed and some forms of futures went unregulated. In 1973 and 1974, hearings were held by committees in both Houses of Congress on the state of the futures markets.[9] As a result of those hearings, it was decided that a major revision of the existing regulatory structure was required. In lieu of the existing system of overlapping regulation by numerous state and federal agencies, Congress created a single federal agency equipped with broad authority to regulate futures trading and exchange activities. Where the Commission's jurisdiction was made "exclusive," the jurisdiction of other federal agencies such as the SEC, the Department of Agriculture and the Department of Treasury, and of the state agencies, was preempted so that "[t]he potential for a hodgepodge of regulatory requirements, acting in countervailing or conflicting fashion to one another . . .", Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vanderbilt L.Rev. 1, 5 (1976), would be avoided.

In addition to broad rule-making authority, the Commission was equipped with significant enforcement powers, including the authority to conduct investigations; to issue cease and desist orders; to obtain court-ordered injunctions; and to punish specified fraudulent conduct with fines of up to $100,000 (later increased to $500,000) or imprisonment for not more than five years, or both, *see generally* Section 13 of the Act.

The legislative history makes clear that Congress intended the Commission to exercise sole jurisdiction over the *regulation* of futures contracts. See, *e. g.*, H.Rep.No. 93–1383, 93rd Cong. 2d Sess. (1974) at 35, U.S. Code Cong. & Admin. News 1974, pp. 5843, 5897 ("Under the exclusive grant of jurisdiction to the Commission, the authority in the [CEA] . . . would preempt the field insofar as futures regulation is concerned."); S.Rep.No. 95–8580, 95th Cong., 2d Sess. (1978) at 13, U.S.Code Cong. & Admin. News 1978, pp. 2087, 2101 ("The [Commission] was created in order to assure that a single expert agency would have the responsibility for developing a coherent regulatory program encompassing futures trading and related activities. Therefore, Congress has vested in the Commission exclusive jurisdiction to build upon the foundation provided by the [CEA] in erecting a sound and strong Federal regulatory policy governing futures trading").[10]

---

**9.** In the House, hearings were held by the House Agricultural Committee, see Hearings on H.R. 11,955 Before House Comm. on Agric., 93rd Cong., 2d Sess. (1974); in the Senate, hearings were held before the Senate Committee on Agriculture and Forestry: see Hearings on S.2485, S.2578, S.2837 & H. R. 13,113 Before the Sen. Comm. on Agric. & Forestry, 93rd Cong., 2d Sess. (1974).

**10.** Defendant contends that in several recent decisions, the courts have held that all federal and state agencies are precluded by the "exclusive jurisdiction" provision of the Act from bringing suit to enjoin the allegedly fraudulent sale of commodity futures and that these decisions demonstrate that exclusive jurisdiction over all schemes involving futures falls under the Act. See, *e. g.*, *S. E. C. v. American Commodity Exchange, Inc.*, 546 F.2d 1361 (10th Cir. 1976); *S. E. C. v. Univest, Inc.*, 410 F.Supp. 1029 (N.D.Ill.1976). Those decisions are clear-

ly consistent with the vesting of exclusive authority to *regulate* the futures market in the Commission; where the Commission's jurisdiction is exclusive, the jurisdiction of other regulatory agencies, state and federal, is preempted. This frees the exchanges from having to conform their practices to conflicting agency standards. However, these decisions do not establish that law enforcement agencies are precluded from prosecuting alleged frauds under criminal provisions other than those contained in the Act.

The courts are split over whether in light of the "exclusive jurisdiction" language in Section 2 of the Act and the "reparation" procedure provided to complainants under the Act, an implied right of action exists under the Act. Compare *Berman v. Bache, Halsey, Stuart, Shields, Inc.*, 467 F.Supp. 311, Comm.Fut.L. Rep. (CCH) ¶ 20,796 (S.D.Ohio 1979) *with R. J. Hereley & Son Company v. Stotler & Company*,

Although Congress equipped the Commission with the power to prosecute violations of the Act by including civil and criminal sanctions in the Act, there is no indication in the legislative history of a Congressional intent to make the criminal sanction provisions of the Act the sole vehicle for prosecuting fraud in the sale of futures. The various House, Senate, and Conference Reports make no reference to the general federal criminal statutes, except for the antitrust statutes, or the potential impact of the Act on those general statutes.

The little evidence relevant to this issue in the legislative history supports the Government's view that Congress contemplated that both the Act and the general criminal antifraud statutes would be utilized to punish fraud in futures markets. In a report issued by the Senate subsequent to the enactment of the 1974 Act, it was expressly stated that the Act did not preempt the *states* from enforcing their general antifraud statutes: "The Committee realizes that many fraudulent schemes are devised to prey on the unsuspecting and unsophisticated investor. In many cases, these schemes purport to deal in commodities trading. The States are encouraged to continue to utilize their criminal antifraud statutes to discourage such schemes." Senate Committee Report on H.R.J.Res. 335, S.Rep.No. 94–73, 94th Cong., 1st Sess. (1975) at 5–6. In the 1978 Amendments to the Act, Congress expressly provided that state officials were not precluded from proceeding in state court on the basis of an alleged violation of any general criminal antifraud statute. Pub.L.No. 95–405, 92 Stat. 865 (1978), *codified at* 7 U.S.C. § 13a–2(7) (Supp.1978).

In addition, in introducing the 1974 Act to the Senate for consideration, Senator Talmadge, Chairman of the Senate Committee on Agriculture and Forestry, stated:

"In establishing this Commission, it is the committee's intent to give it exclusive jurisdiction over those areas delineated in the act. This will assure that the affected entities-exchanges, traders, customers, et cetera—will not be subject to conflicting agency rulings. However, it is not the intent of the committee to exempt persons in the futures trading industry from existing laws or regulations such as the antitrust laws . . . ." 120 Cong. Rec. S. 30459 (Sept. 9, 1974).

In summary, there is no indication in the legislative history that, with the passage of the Act, Congress intended to repeal the general federal criminal antifraud statutes insofar as they relate to commodity futures. The Court must next determine whether there is a repugnancy in the subject matter of the two statutes which would justify an implication of repeal.

## D. The Mail Fraud Statute and Section 6o

The Court concludes that the mail fraud statute and the antifraud provisions of the Act "can exist and be useful, side by side," *Edwards v. United States*, 312 U.S. 473, 484, 61 S.Ct. 669, 675, 85 L.Ed. 957 (1941).

The language of the mail fraud statute is broad: it condemns any scheme to defraud in which the mails are employed, *Parr v. United States*, 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1960); it protects "the gullible public against the various fraudulent schemes that the cunning of the trickster could devise," *United States v. Henderson*, 386 F.Supp. 1048, 1052–53 (S.D. N.Y.1974). And even where Congress has enacted comprehensive legislation, including criminal sanctions, to govern conduct in a particular field, the courts have very often held that the mail fraud statute continues in force. See generally *Edwards v. United States, supra; United States v. Rollnick, supra; United States v. Alluan*, 13 F.Supp. 289 (N.D.Tex.1936) (mail fraud statute and antifraud provisions of the Securities Act of 1933); *United States v. Weatherspoon*, 581 F.2d 595 (7th Cir. 1978)

466 F.Supp. 345, Comm.Fut.L.Rep. (CCH) ¶ 20, 773 (N.D.Ill.1979) ("we cannot agree with defendant that the term exclusive jurisdiction when read in the context of the entire provi- sion, prohibits this court from entertaining a private action for fraudulent acts of a futures commission merchant").

(mail fraud statute and false statement statute); *United States v. Green, supra* (mail fraud statute and the Truth-In-Lending Act); *United States v. Azzarelli Construction Co.*, 459 F.Supp. 146 (E.D.Ill.1974) (mail fraud statute and the Sherman Act); *United States v. Pocono International Corp.*, 378 F.Supp. 1265 (S.D.N.Y.1974) (mail fraud statute and the Interstate Land Sales Full Disclosure Act). But see *United States v. Henderson, supra* (Judge Weinfeld found in Congress' subsequent enactment of the comprehensive criminal antifraud provisions of the Internal Revenue Code a latent intent to preempt the field of sanctions for tax fraud violations). Subsequent appellate court decisions have either limited *Henderson* to its facts or disagreed with its holding. See, e. g., *United States v. Weatherspoon, supra*, 581 F.2d at 599–600; *United States v. Miller*, 545 F.2d 1204, 1216 n.17 (9th Cir. 1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977).

Mr. Chief Justice Burger recently commented on the role of the mail fraud statute in prosecuting fraud:

"Section 1341 of Title 18 U.S.C. has traditionally been used against fraudulent activity as a first line of defense. When a 'new' fraud develops—as constantly happens—the mail fraud statute becomes a stopgap device to deal on a temporary basis with the new phenomenon, until particularized legislation can be developed and passed to deal directly with the evil.

\*   \*   \*   \*   \*   \*

"The mail fraud statute continues to remain an important tool in prosecuting frauds in those areas where legislation has been passed more directly addressing the fraudulent conduct. Mail fraud counts fill pages of securities fraud indictments even today [citation omitted]. Despite the pervasive Government regulation of the drug industry, postal fraud statutes still play an important role in controlling the solicitation of mail-order purchases by drug distributors based upon fraudulent misrepresentations. Hart, The Postal Fraud Statutes: Their Use and Abuse, 11 Food Drug Cosm.L.J. 245, 247, 261 (1956). Maze's interstate escapade—of which there are numberless counterparts—demonstrates that the federal mail fraud statute should have a place in dealing with fraudulent credit card use even with 15 U.S.C. § 1644 on the books.

"The criminal mail fraud statute must remain strong to be able to cope with the new varieties of fraud that the ever-inventive American 'con artist' is sure to develop. Abuses in franchising and the growing scandals from pyramid sales schemes are but some of the threats to the financial security of our citizenry that the Federal Government must be ever alert to combat. Comment, Multi-Level or Pyramid Sales Systems: Fraud or Free Enterprise, 18 S.D.L.Rev. 358 (1973)."

*United States v. Maze*, 414 U.S. 395, 405–07, 94 S.Ct. 645, 651–52, 38 L.Ed.2d 603 (1975) (Burger, C. J., dissenting).[11]

The mail fraud statute and the criminal provisions of the Act are not in conflict; instead, they complement each other. *Accord, United States v. Brien*, No. 78–327–F, slip op. at 12–13 (D.Mass., Dec. 29, 1978). The Court concludes that there is no conflict between the two statutory provisions which would justify an implication of repeal.

Another test the courts have applied in determining whether a later-enacted and more specific statute preempts an older, more general statute is to determine whether the proof required to establish a violation under the two statutes varies, see *United States v. Green, supra*, 494 F.2d at 826–27.

---

11. In *Maze* the Supreme Court overturned petitioner's conviction under the mail fraud statute on the ground that the Government had not established that the use of the mails was an integral part of petitioner's scheme to defraud by the use of stolen credit cards. The Court did not reach another issue raised by the petitioner—whether the mail fraud statute had been repealed in part by the passage of a recent law specifically outlawing credit card fraud (the Truth-In-Lending Act).

Where the proof required under each statute differs, the courts have held that the more specific statutes does not preempt the more general statute. See, *e. g., United States v. Green, supra; United States v. Pocono International Corp., supra.*

■ The essential elements of mail fraud are (1) a scheme to defraud and (2) the mailing of a letter, etc., for the purpose of executing the scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Section 6*o* of the Act requires that (1) the defendant be a commodity trading advisor or a commodity pool operator; (2) that he employ a scheme to defraud a potential client or participant; and (3) that he use the mails or any means or instrumentality of interstate commerce. Section 6*o* requires proof of additional elements that need not be established to obtain a conviction under the mail fraud statute. Furthermore, the jurisdictional provisions of the two statutes vary: Section 6*o*, like Rule 10b–5, 17 C.F.R. § 240.10b–5, implementing Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, requires proof that the mails or any other means of interstate commerce were used; the mail fraud statute requires proof that the postal system was utilized. *Cf. United States v. Pocono International Corp., supra.*

For the foregoing reasons, the Court concludes that the mail fraud statute has not been implicitly repealed by Section 6*o* of the Act. Defendant's motion to dismiss on the ground that the exclusive jurisdiction for prosecuting defendant lies under the Act is denied. Defendant's request for an evidentiary hearing is denied as well. Defendant has not stated what evidence he would introduce at such a hearing; nor has he suggested that material facts, relevant to the resolution of this issue, are in dispute.

## II. Selective Prosecution

■ Defendant moves to dismiss the indictment in the instant matter on the ground that this is a selective prosecution.

Defendant alleges that in the past eight years, the Commodity Futures Trading Commission has instituted a criminal proceeding against an individual for the type of violations alleged herein on only one other occasion, while defendant's review of reported decisions reveals that the Commission has instituted civil proceedings against commodity trading houses for violations similar to those charged in the instant indictment in more than two hundred instances. Defendant contends that the Commission's institution of criminal, as contrasted with civil, proceedings in only 1% of the cases demonstrates that the agency has singled him out for criminal prosecution. The Government disputes the accuracy of defendant's figures.

Defendant contends that he has been singled out for criminal prosecution because he was actively involved in opposing the new rules and regulations concerning the commodity trading industry proposed by the Commission. Defendant's company was a plaintiff in an action instituted against the Commission which sought to enjoin the agency from implementing these new rules. He also voiced his opposition to the new rules and regulations at hearings held before the United States Congress. Defendant alleges that on three occasions agents of the Commission informed him that his activities would "cost him his business."

In *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974), the court stated that:

"To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights."

■ A defendant is entitled to an evidentiary hearing on a claim of selective prosecution where he has made an initial showing that there is a colorable basis for his contention. *United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973). In those cases in which an evidentiary hearing has been granted, the defendant has presented evidence in support of his motion, including the basis for his conclusion that only a small number of others similarly situated have been proceeded against because of conduct of the type that the defendant is alleged to have engaged in, and facts sufficient to raise a reasonable doubt about the prosecutor's purpose. See generally *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973); *United States v. Carson*, 434 F.Supp. 806 (D.Conn. 1977).

Abrahams has not supported his contentions with any evidentiary matter; he has not submitted any documentary evidence or affidavits to the Court. Accordingly, the Court will deny Abrahams' request for an evidentiary hearing without prejudice to renewal of the motion at a later date if a proper evidentiary basis for the motion is laid.

### III. Pre-Indictment Publicity

■ Defendant moves to dismiss the indictment pursuant to Rule 12(b)(2), F.R. Crim.P., on the ground that his right to an unbiased panel of grand jurors was effectively denied by a vast amount of prejudicial pre-indictment publicity. In the alternative, defendant requests an evidentiary hearing and an opportunity to interview the members of the grand jury panel.

■ The general rule is that actual prejudice or bias as a result of pre-indictment publicity must be shown before an indictment will be dismissed. *United States v. Mandel*, 415 F.Supp. 1033, 1061–65 (D.Md. 1976); *United States v. Anzelmo*, 319 F.Supp. 1106, 1113–14 (E.D.La.1970), and decisions cited therein. Defendant contends, however, that dismissal of the indictment is appropriate in the instant case because the publicity was Government inspired, relying on *United States v. Sweig*, 316 F.Supp. 1148 (S.D.N.Y.1970), wherein then Judge Frankel stated that where pre-indictment publicity was Government generated, a dismissal of the indictment might be warranted.

"Granted the historic proposition that grand juries may roam fairly widely (and certainly outside the limits of Wigmore's concerns) in collecting their factual beliefs, e. g., *Costello v. United States, supra*, [350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397] it can hardly be doubted now that prosecutors must observe some limits of essential fairness in their work with such investigatory bodies. See *United States v. Umans*, 368 F.2d 725, 730 (2d Cir. 1966). Unless the role of the grand jury as a shield for the citizen as well as a prosecutorial agency is to become an empty slogan, there are kinds of pressure that must obviously be avoided to the extent possible. However free may be the sources of 'fact,' the generation of public animus against a prospective defendant, with the attendant danger that grand jurors may be subjected to subtle or explicit 'demands' for prosecution, see *Sheppard v. Maxwell*, 384 U.S. 333, 339–342, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); see also *Beck v. Washington*, 369 U.S. 541, 585–587, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962) (Douglas, J., dissenting), is no part of the prosecution's legitimate business. It may be (at least the court accepts for now, as defendants appear to do) that such 'atmospheric' influences have to be dealt with by measures short of dismissing indictments when the sources and causes are wholly non-official. But the interest in the integrity of the criminal process *may require* sterner measures of prophylaxis if the prosecution itself forgets its duty to 'be sensitive to the considerations making for wise exercise of such investigatory power.' *Hoffman v. United States*, 341 U.S. 479, 485, 71 S.Ct. 814, 817, 95 L.Ed. 1118 (1951)." *Id.* at 1153 (emphasis supplied).

The defendants in *Sweig* contended that the "official" informants referred to in various newspaper articles reporting allega-

tions of misconduct by the defendants were Government informants; the Government submitted an affidavit in which it denied that any members of the United States Attorney's office had given out the information reported in the press. Judge Frankel denied the motion to dismiss the indictment and for an evidentiary hearing. He concluded that the "defendants have failed to present a concrete basis for inferring that Government officials were responsible in any substantial degree for the unquestionably considerable amount of publicity preceding the indictment. *Cf. United States v. Kahaner,* [204 F.Supp. 921, 922–23 (S.D.N.Y.1962) (Weinfeld, J.)]." *Id.* at 1155. See also *United States v. Mitchell,* 372 F.Supp. 1239, 1247–48 (S.D.N.Y.1973) (Gagliardi, J.) (defendant alleged that newspaper articles ascribed to "sources close to the investigation" evidenced a "leak" from the prosecutor and prejudiced the Grand Jury; Government's affidavit unequivocally denied any leak and described Government's efforts to maintain secrecy; court denied motion to dismiss the indictment and for an evidentiary hearing); *United States v. Kahaner, supra.*

To substantiate his allegation of Government inspired publicity, Abrahams points to (1) several statements in the press attributed to officials including that defendant is "an alleged professional swindler" and "the ultimate con man" (attributed to two unidentified FBI agents) and that defendant's company, Lloyd, Carr & Company, "may well be the biggest fraud problem in the country right now" (attributed to a Commission official); (2) mug shots of defendant which appeared in the press and which defendant alleges must have been obtained from the Government (indeed, one such photograph bears the label "U.S. Marshal, Boston, Mass."); and (3) Chief Judge Caffrey's observation, in his decision transferring an unrelated criminal charge against defendant to another district for trial because of "an atmosphere of pervasive community prejudice" against defendant in Boston, that Boston newspapers were reporting "statements from officialdom hav[ing] a tendency to be clothed with a

particular look of legitimacy in the minds of potential [petit] jurors." *United States v. Abrahams,* 453 F.Supp. 749, 752 (D.Mass. 1978).

In response, the Government has submitted the affidavit of Special Assistant United States Attorney Michael A. Collora, who has been in charge of this matter since December 1977, in which he states in relevant part:

"5. That to his knowledge, the Office of the United States Attorney issued only two press releases concerning Lloyd, Carr and Company during the time frame of the above sitting of the grand jury.

"6. One press release concerned the indictment of Alan Abrahams for lying to a magistrate during his bail proceeding before a federal magistrate, a violation of Title 18, United States Code, Section 1001. Such release, dated January 26, 1978, is attached hereto as Exhibit A.

"7. The other press release concerned the present indictment. It was dated August 3, 1978, and was issued after the grand jury finished deliberating in this matter.

"8. To all other newspaper inquiries during this time, the United States Attorney responded that allegations of fraud concerning the sale of options by Lloyd, Carr and Company was under investigation. Upon the information and belief of the undersigned, the Office of the United States Attorney for the District of Massachusetts supplied no information to the press during this time which was not then a matter of public record."

The affidavit submitted by the Government states that no information not a matter of public record was supplied to the press; Mr. Collora, however, fails to deny that the "mug shots" of defendant were obtained from the Government; to delineate what statements, if any, were made to the press concerning the grand jury investigation before the indictment was returned; or to reveal what, if any, instructions the grand jurors received respecting secrecy. Compare this affidavit with the extensive affidavits submitted by the Government in

*Mitchell, supra* ; *Sweig, supra* ; and *Kahaner, supra*. Therefore, the Court directs that the Government submit more complete affidavits with respect to these allegations.

### IV. Misconduct Before the Grand Jury

Abrahams moves to dismiss the indictment pursuant to Rule 6, F.R.Crim.P., on two grounds: (1) that Government agents who testified as witnesses before the Grand Jury remained at the Grand Jury proceedings after they had completed their testimony in violation of Rule 6(d); and (2) that the prosecutor engaged in misconduct before the Grand Jury.

■ With respect to the first ground, Abrahams alleges that agents of the Commodity Futures Trading Commission and state administrative agencies were present during the grand jury proceedings and during the grand jury's deliberations. Although defendant was granted an opportunity to inspect the grand jury minutes in November of 1978, he submits no affidavit or documentary evidence to support this serious charge, see *United States v. Gold*, 470 F.Supp. 1336 (N.D.Ill.1979); *United States v. Treadway*, 445 F.Supp. 959 (N.D. Tex.1978); *United States v. Daneals*, 370 F.Supp. 1289 (W.D.N.Y.1974). Therefore, defendant's motion to dismiss the indictment on this ground is denied at this time, without prejudice to renewal of a proper evidentiary basis for the motion can be shown.

■ With respect to Abrahams' second ground for dismissal, alleged prosecutorial misconduct before the Grand Jury, defendant alleges that Assistant United States Attorney Collora improperly answered an inquiry from a juror who asked what a commodity futures option is, rather than allowing a witness to respond to that question. However, this did not make Collora both a "fact witness" and a prosecutor as defendant alleges; the situation presented here is readily distinguishable from that in *United States v. Treadway, supra*, on which defendant relies. Nor would Collora's statement, even if hearsay in nature, require a dismissal of the indictment since there remains the testimony of approximately one hundred witnesses to support the indictment. Abrahams' allegation that Collora pressured the Grand Jury Foreman to sign the indictment before all the charges contained therein were presented to the Grand Jury is totally unsupported by either affidavits or documentary evidence. Accordingly, defendant's motion to dismiss the indictment on the ground of prosecutorial misconduct before the Grand Jury is denied.

### V. Speedy Trial

■ Abrahams was arraigned on the instant indictment on August 15, 1978; he is scheduled to be tried on the charges contained in that indictment on February 25, 1980. Defendant moves to dismiss the indictment on the ground that this 18-month delay between arraignment and trial violates the Speedy Trial Act ("the Act"), 18 U.S.C. § 3161 *et seq., as amended by* Pub.L. No. 96–43 (1979), the applicable District Court Plans, and the Sixth Amendment's guarantee of a speedy trial. In opposition to defendant's motion to dismiss, the Government has submitted several affidavits relating the history of this proceeding, as well as a proposed order computing periods of exclusion under Section 3161(h) of the Act.

The Court has reviewed the record in this case and finds that the following periods of time are excludable under Section 3161(h): [12]

---

12. The Court notes that this is a conservative estimate of the number of excludable days. For example, while the case was in Massachusetts, certain additional days, during which the parties were filing responses to the various pretrial motions, might be excludable under Section 3161(h)(1).

| Event | Dates | Number of Days Excluded | Reason |
|---|---|---|---|
| 1. Trial of Defendant in Western District of Michigan | 8/22–9/6/78 | 16 | Section 3161(h)(1)(C); Plan for Prompt Disposition of Criminal Cases for the District of Massachusetts [Mass. Plan] (6/29/78), at 15.* |
| 2. Continuance | 9/11–9/27 | 17 | Excludable Pursuant to the Order of Magistrate Princi, dated December 6, 1978. |
| 3. Trial of Defendant in Western District of Texas | 10/9–10/24 | 16 | See explanation for item 1, *supra*. |
| 4. Hearings on Pre-Trial Motions | 10/26–11/7 | 13 | See explanation for item 2, *supra*. |
| 5. Discovery Motions Under Advisement | 11/7–12/6 | 30 | See explanation for item 2, *supra*. |
| 6. Hearing Date on Motion for a Change of Venue to Order Granting Defendant's Motion | 11/22–12/29 ** | 23 | Section 3161(h)(1)(E), (G); See Mass. Plan, at 7. |
| 7. Date of Transfer from D. Massachusetts to date D. Arizona received case papers | 12/30/78–1/8/79 | 10 | Section 3161(h)(1)(G). |
| 8. Trial of Co-Defendants in D. Massachusetts to time Government prepared for Trial in D. Arizona | 1/9–3/5 | 56 | Section 3161(h)(8); See Judicial Council of the Second Circuit, Guidelines Under the Speedy Trial Act [Guidelines] (1/16/79), at 40.*** |
| 9. Defendant's Request, Dated April 3, 1979, for Continuance of April 24 Trial Date to June 13 | 4/24–6/1 | 39 | Section 3161(h)(8); Guidelines, at 39. |
| 10. Date of Motion for Change of Venue filed to Date Granted | 6/1–6/4 | 3 | Section 3161(h)(1)(E), (G). |
| 11. Date Transferred from D. Arizona to date Assigned to this Court | 6/5–6/21 | 17 | Section 3161(h)(1)(F); See Guidelines, at 22. |
| 12. Time Allowed Defendant to file Pre-Trial Motions; Continuances Requested by Defendant | 6/26–7/27 | 32 | Section 3161(h)(1); See Guidelines, at 9–10. |
| 13. Motion to Dismiss Indictment on Double Jeopardy Grounds Under Advisement | 7/28–8/8 | 12 | Section 3161(h)(1)(G) |
| 14. Date Interlocutory Appeal Filed by Defendant Until Date Defendant Withdrew his Appeal | 8/17/79–1/14/80 | 151 | Section 3161(h)(1)(D). |
| 15. Motions to Dismiss Indictment Under Advisement; Bail Hearings; Continuances Requested by Defendant | 1/15–2/13 | 30 | Section 3161(h)(1)(E), (h)(1), and (h)(1)(G). |
| 16. Hearings on Motions to Suppress; Motions Under Advisement | 2/14–2/25 | 12 | Section 3161(h)(1)(E), (h)(1), and (h)(1)(G). |

Total Excludable Time 477 Days

* The excludable delay resulting from a trial of defendant on other charges, under the District of Massachusetts Plan, commences on the date that such other trial begins and concludes 14 days after the termination of that trial.

** Periods of overlap are counted only once.

*** The Guidelines provide that: "When the Court orders the severance of the trial of one or more co-defendants either before trial commences or during trial, the 'ends of justice' will generally require that an (h)(8) continuance be granted to postpone trial of the severed defendant(s) to a date after the conclusion of the first trial that affords the Government attorney time to prepare for the second trial." In this case, the co-defendants were on trial between January 17 and February 23, 1979; the Government indicated on March 5, 1979 that it was ready to try Abrahams in Arizona.

A total of 559 days will have elapsed between the date Abrahams was arraigned and the date on which trial will begin; 477 days are excludable under the Act; 82 nonexcludable days remain. Under the provisions of the Act, 18 U.S.C. § 3161(g), Abrahams should be tried within 80 days of arraignment; therefore the delay exceeds the maximum by 2 days. The mandatory dismissal of an information or indictment which will eventually be required as a sanction for failure to comply with provisions of the Act is not yet effective. See Speedy Trial Act Amendments of 1979, Pub.L. No. 96–43, at § 6. Prior to the effective date of the sanctions, July 1, 1980, a violation of the Act is not, in and of itself, a sufficient reason for dismissal of an indictment; although such a violation may be considered as a factor in a court's analysis of a claimed violation of a defendant's constitutional right to a speedy trial. *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368 (2d Cir. 1979).

█ The Court assumes that the 18-month delay in this case is sufficient to "trigger" the constitutional analysis of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), where the Supreme Court enunciated the essential factors to be considered in determining a denial of the Sixth Amendment right to a speedy trial: "These are the length of the delay; the reason for it; whether or not the claimant has asserted his speedy trial rights; and the resulting prejudice." *In re Michael Rappaport*, 558 F.2d 87 (2d Cir. 1977). It is clear that Abrahams fails to meet any of these tests.

First, the delay here is substantially less than the delay in cases wherein the courts have found a speedy trial violation, see *United States v. New Buffalo Amusement Corp., supra* (54-month delay), and cases cited in *United States v. Lane*, 561 F.2d 1075, 1078 (2d Cir. 1977). Second, defendant was responsible for most of the delay. The Government stood ready to try this case in Boston in January 1979; in Arizona on April 24 and June 13; and in New York in September and October 1979. On each occasion defendant delayed the start of the trial: in Boston, by moving for a change of venue; in Arizona, first by moving for a continuance on account of his attorney's other commitments and then by moving for a change of venue; and in New York, by requesting several continuances of the trial date and by filing an interlocutory appeal from the denial of his double jeopardy motion even after being informed by various attorneys that the motion was meritless—an appeal which deprived this Court of jurisdiction over this matter for five months. For the same reasons, the third factor mentioned by the Supreme Court—defendant's assertion of his right to a speedy trial—weighs heavily against defendant. "Rather than 'repeatedly and energetically assert[ing] his rights,' as in *United States v. Vispi* [545 F.2d 328, 334 (2d Cir. 1976)] [Abrahams], like the defendant in *Barker v. Wingo, supra*, apparently 'did not want a speedy trial,' 407 U.S. at 534 [, 92 S.Ct. at 2194] . . ." Finally, with regard to the fourth *Barker* factor, defendant cites no specific prejudice to himself from the delay. Taking all of the *Barker v. Wingo* factors into account, along with the brevity of the violation of the Act, the Court finds no violation of defendant's Sixth Amendment rights.

*Conclusion*

Abrahams' motions to dismiss the indictment on the grounds (1) that he is being prosecuted under the wrong criminal statute; (2) that prosecutorial misconduct occurred before the Grand Jury; and (3) that his right to a speedy trial has been violated are hereby denied. Abrahams' motion to dismiss on the grounds (4) that he is being selectively prosecuted; and (5) that Rule 6(d), F.R.Crim.P. has been violated because unauthorized persons appeared in the Grand Jury room are denied without prejudice to renewal. With respect to Abrahams' motion to dismiss based on pre-indictment publicity, Mr. Collora shall submit affidavits with this Court within ten days of the date of this order.

SO ORDERED.